(646 P.2d 1149)

No. 53,399

No. 53,455

COLONIAL INVESTMENT COMPANY, INC., *Appellant/Cross-Appellee,*
v. THE CITY OF LEAWOOD, KANSAS, *Appellee/Cross-Appellant.*

Opinion filed June 17, 1982.

*Paul D. Sinclair, John P. Hastings,* and *Charles M. Thomas,* of Grier, Swartzman & Weiner, of Kansas City, Missouri, and *William V. North,* of North, Lancaster & Dickson, of Overland Park, Kansas, for the appellant/cross-appellee.

*Larry Winn III* and *Robert F. Bennett,* of Bennett, Lytle, Wetzler, Winn & Martin, of Prairie Village, for the appellee/cross-appellant.

Before SWINEHART, P.J., ABBOTT, J., and HARRY G. MILLER, District Judge Retired, Assigned.

MILLER, J.: Both parties to this lawsuit have appealed from the rulings of the trial court in a zoning dispute.

In Count I of its second amended petition, plaintiff landowner, Colonial Investment Company, Inc., sought to estop the defendant City of Leawood from zoning the disputed tract as noncommercial; in Count II plaintiff prayed for a declaratory judgment declaring that the land was in fact zoned commercial; in Count

III plaintiff asked the court to declare that Colonial had a vested right to use the land for commercial development; and in Count IV plaintiff asserted a cause of action for inverse condemnation.

The case came before the trial court on Colonial's motion for summary judgment on Count II of its petition, and on the City's motion to dismiss all four counts of plaintiff's petition for failure to state sufficient facts upon which relief could be granted.

The trial court sustained Colonial's motion for summary judgment on Count II of its action, and sustained the City's motion to dismiss Counts I and III. It retained jurisdiction to hear Count IV of the action if necessary. It is from the rulings on the first three counts that the parties have appealed.

Based upon uncontroverted allegations of fact made by both parties, the trial court found that when the Leawood Drive-In was built on the disputed tract it was located in Oxford Township, and that the tract had been validly zoned for commercial use by action of the Township and the Board of County Commissioners. The tract was annexed to the City of Leawood by ordinance adopted February 20, 1967.

The court further found that on December 1, 1969, the city council of the City of Leawood passed a resolution recommending that Land Use Plan A, prepared by Black & Veatch, as amended, be adopted by the Leawood Plan Commission. On December 22, 1969, based upon the recommendation of the city council, the Leawood Plan Commission approved and adopted a Future Land Use Plan. Both of these plans designated the Leawood Drive-In tract for commercial use.

On February 24, 1975, the Leawood Plan Commission adopted a Comprehensive City Plan for the entire city which reaffirmed the tract's commercial designation.

The trial court made specific findings of fact as follows:

"8.  On April 25, 1977, Wilson M. Williams, plaintiff's president, appeared before a regularly scheduled meeting of the City Plan Commission of Leawood and stated that he was contemplating purchasing the Leawood Drive-In to develop it for commercial use, and that he wanted to ascertain the zoning status of the tract. The City Plan Commission stated that the tract had been zoned for commercial use by the Oxford Township; that the commercial zoning had been in part recognized by Leawood as evidenced by its master plan; and that the primary issue with respect to the use of the property would be the quality of the development. The City Plan Commission indicated that it would impose the highest standards with respect to the quality of any commercial development.

"9.  In reliance upon the Leawood Land Use Plan, the Comprehensive City

Plan, the representations of the City Plan Commission and other officials of the City, plaintiff agreed to purchase the tract from L & N Properties, a general partnership, at a substantially higher price than would have been paid had the use of the property been restricted to residential dwellings.

"10. After execution of the contract for sale on the tract, plaintiff was advised by the City that a question as to the legality of the zoning existed and that plaintiff would be required to apply for rezoning of the property. The City agreed that plaintiff's application for rezoning would be without prejudice to its claim that the Leawood Drive-In was zoned for commercial use.

"11. Plaintiff then submitted a proposal and application for rezoning to the City Plan Commission for the development of the 37-acre site as a planned commercial and planned residential development. Finding that plaintiff's proposed development met the spirit and intent of the Zoning Regulations and was consistent with all the City's planning documents, the Plan Commission recommended approval of the zoning request by the City Council.

"12. Prior to the vote of the City Council on April 17, 1978, concerning this zoning, the City Attorney determined that a valid zoning protest had been filed and that a three-fourths vote of the Council was therefore required.

"13. On April 17, 1978, the City Council in reliance upon said ruling of the City Attorney and with seven members of the City Council present, rejected the plaintiff's proposed development by a four to three vote and requested the City Plan Commission reconsider the application.

"14. After reconsidering said application, the Plan Commission sent back to the City Countil its earlier recommendation of approval.

"15. Thereafter, the City Attorney determined the zoning protest was not valid, and then informed the Council that they must reconsider the vote taken on April 17, 1978. With eight council members present, the motion for reconsideration was declared defeated when four voted in favor of reconsideration and four voted against.

"16. The City Council has failed to reconsider this matter and it is now apparent that it will not further consider said ordinances."

The essence of Colonial's claim as set forth in Count I is that it reasonably relied, to its detriment, upon the acts and representations of the City and its officers that the land was zoned commercial, and that the City should now be estopped from zoning the land as noncommercial.

The most recent summarization of the theory of equitable estopped and its application appears in *Lines v. City of Topeka,* 223 Kan. 772, 780, 577 P.2d 42 (1978). There the court stated:

"In *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 527, 561 P.2d 792 (1977), we stated:

" '. . . Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show

it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. (*Wichita Federal Savings & Loan Ass'n v. Jones,* 155 Kan. 821, 130 P.2d 556, 31 C.J.S., Estoppel, § 59, p. 367.)'

"On several occasions this court has applied the doctrine of equitable estoppel against cities where the facts of the case so required. (See, *Skaggs v. City of Pratt,* 183 Kan. 424, 327 P.2d 1083 [1958]; *Derby Oil Co. v. City of Oxford,* 134 Kan. 59, 4 P.2d 435 [1931]; *State, ex rel., v. City of Hutchinson,* 103 Kan. 370, 175 Pac. 147 [1918]; *City of Belleville v. Hallowell,* 41 Kan. 192, 21 Pac. 105 [1887]; *City of Leavenworth v. Laing,* 6 Kan. 274 [1870].)

"In *Benson v. City of DeSoto,* 212 Kan. 415, 422, 510 P.2d 1281 (1973), it was said:

" '. . . It is generally recognized that with respect to matters within the scope of its power and authority to act, a municipal corporation is subject to the rules of estoppel in those cases wherein equity and justice require their application and where such application will not interfere with the proper exercise of governmental functions; but where there is an entire absence of such power on its part, there can be no estoppel as against the municipality or its inhabitants. (28 Am. Jur. 2d, Estoppel and Waiver, § 128.) . . .' "

In pressing its argument on estoppel, Colonial relies upon two types of City action: (1) the official acts of the City in passing the 1969 Future Land Use Plan and the 1975 Comprehensive City Plan, and (2) the representations of various city officials about the zoning classification of the subject property prior to its purchase by Colonial.

The so-called master plans adopted by a city for future land use are generally recognized as general outlines of the long-term, projected development of an area. Such plans differ from a zoning ordinance which is but one of the tools for implementing such a plan. Haar, *In Accordance with a Comprehensive Plan,* 68 Harv. L. Rev. 1154, 1156 (1955). The adoption of such a plan raises no implication or representation that the plan may not be subsequently modified in the light of future developments.

Colonial argues, however, that the representations made by various city officials and the planning commission in conjunction with the comprehensive land use plans constitute sufficient assurances to serve as a basis for estoppel. In support of this contention, Colonial relies upon the Kansas cases cited above which hold that actions or statements by city officials may serve as a basis for estoppel.

An analysis of these cases, however, shows that in each case in which estoppel was invoked against the City, the actions or representations made by the City or its officials were undertaken

or made with the specific intent and purpose of inducing the complaining party to act in reliance thereon.

Here, the record discloses that there was a conversation between several members of the city council of Leawood at a council meeting regarding the zoning classification of the Leawood Drive-In. Several councilmen and the city attorney apparently had personal knowledge of the tract's commercial classification and expressed themselves accordingly. We do not believe that these matter-of-fact statements made by several members of the council in response to a request for information can reasonably be construed as a conscious intent on the part of the city council and its members to induce Colonial to buy the disputed tract for commercial development. Nor do we find anything in the record to support Colonial's assertion that the City represented that it would continue the commercial zoning.

Likewise, the representations and statements made by the city planning commission are not the basis for estoppel of the city council, since the actions of a planning commission are advisory. *City of DeSoto v. Centurion Homes, Inc.*, 1 Kan. App. 2d 634, 573 P.2d 1081, *rev. denied* 225 Kan. 843 (1977). In *Houston v. Board of City Commissioners*, 218 Kan. 323, Syl. ¶ 3, 543 P.2d 1010 (1975), the court said:

"The function of a planning commission is advisory only. The final authority in zoning matters rests with the governing body possessing legislative power."

The trial court did not err in holding that under the circumstances here the City was not estopped.

As a further issue, the parties disagree as to the status of zoned property when annexed by a city. Neither of the parties question the power of a city to rezone property upon annexation. But Colonial contends that annexed property retains its zoning until rezoned by the city. The City's position is that the property loses its zoning classification upon annexation, and comes into the city unzoned.

This is an issue of first impression in Kansas appellate courts. Other jurisdictions have taken several different approaches.

In some jurisdictions, annexed property retains its zoning classification until rezoned by the city. *Maricopa County Bd. of Super. v. Bell 51st Investors*, 108 Ariz. 261, 495 P.2d 1315 (1972); *Highland Village Co. v. City of Jackson*, 243 Miss. 34, 137 So. 2d 549 (1962); and *Dahman v. City of Ballwin*, 483 S.W.2d 605 (Mo. App. 1972).

Other jurisdictions have held that annexation strips the property of any zoning and that it comes into the city unzoned. *Ben Lomond, Inc. v. City of Idaho Falls,* 92 Idaho 595, 448 P.2d 209 (1968); *Ellish v. Village of Suffern,* 30 App. Div. 2d 554, 291 N.Y.S.2d 178 (1968).

Still other jurisdictions have statutes creating interim zoning, *Taylor v. City of LR,* 266 Ark. 384, 583 S.W.2d 72 (1979), and *Allred v. Lakewood,* 40 Colo. App. 238, 576 P.2d 186 (1977); or making zoning a part of the annexation ordinance, *Beshore v. Town of Bel Air,* 237 Md. 398, 206 A.2d 678 (1965). Some of these cases turn on particular statutes or ordinances.

The trial court adopted the position expressed in *Dahman,* that a change in the boundaries of sovereigns should have but a minimal effect on zoning ordinances which govern the conduct of landowners, and that the soundest way to protect property of zoning is to require that property retains its zoning classification upon annexation until rezoned.

Kansas statutes regarding zoning are found at K.S.A. 12-701, *et seq.,* for cities and joint committees of city and county planning boards, and at K.S.A. 19-2901, *et seq.,* for counties and townships. K.S.A. 19-2925a reads in pertinent part as follows:

"[A]ny zoning resolution adopted by any county under the provisions of the act of which this act is amendatory shall continue in force and effect the same as though adopted under the provisions of this act, until the same is modified or a new plan or part thereof . . . or zoning resolution is adopted as provided in this act."

This section was passed into law in 1965. At the same time the legislature passed an identical section with respect to the duration of zoning adopted by cities, K.S.A. 12-715a. See also K.S.A. 12-705a, 12-706a.

Although these statutes do not deal directly with the issue of zoning, they do indicate the legislature's underlying policy that stable land uses are beneficial to the public welfare and that such stability is enhanced by continuity of zoning.

In the final analysis, this result does not deprive the city of anything. It retains its sovereign right to rezone the property at any time after annexation, or to delineate the proposed use through affirmative zoning action at the time of annexation.

Finally, we are called upon to decide whether the trial court erred in holding that Colonial did not acquire a vested right to develop the land in accordance with its plans.

In most jurisdictions that have considered the problem, it is held, as a general rule, that a landowner has no vested right in the continuity of zoning in a particular area so as to preclude subsequent amendment, and that a zoning regulation may be retroactively applied to deny an application for a building permit, even though the permit could lawfully have been raised at the time of application. Annot., 50 A.L.R.3d 596, § 3. See also Annot., 49 A.L.R.3d 13.

An exception to the general rule has been recognized, however, in a number of jurisdictions where the landowner has incurred substantial liabilities or performed substantial work in reliance upon a valid zoning regulation, and the court has found that it would be inequitable and unjust to destroy the landowner's right to proceed. In such cases it has been held that the landowner acquired a vested right to proceed with the intended development. 82 Am. Jur. 2d, Zoning and Planning § 22. Colonial contends that it falls within this exception.

Evaluation of this claim requires a determination of the point in the development process at which the landowner can be said to have acquired such a vested right.

The City, in relying upon *Ware v. City of Wichita,* 113 Kan. 153, 214 Pac. 99 (1923), argues that in determining the substantiality of change necessary to establish a vested right, the court may consider only those expenditures and work done after a building permit has issued and construction has begun, neither of which has taken place in this case.

Colonial contends that such a test for substantiality of change is outdated and is neither realistic nor fair as applied to a multi-acre commercial development in the present environment of urban development, where in addition to purchasing the property, extensive liabilities for architectural, engineering and legal services are required in preparation for development before applying for a building permit. It argues that all of these expenses must be considered by the court. To support this contention, Colonial cites *Hollywood Beach Hotel Co. v. City of Hollywood,* 329 So. 2d 10 (Fla. 1976); *DeKalb County v. Chapel Hill,* 232 Ga. 238, 205 S.E.2d 864 (1974); *American Nat. B. & T. Co. v. City of Chicago,* 19 Ill. App. 3d 30, 311 N.E.2d 325 (1974); *People ex rel. Shell Oil Co. v. Town of Cicero,* 11 Ill. App. 3d 900, 298 N.E.2d 9

(1973). See also *Life of the Land, Inc. v. Land Use Commission,* 61 Hawaii 3, 592 P.2d 26 (1979).

Arguably, there is equity in Colonial's claim that all of its expenses in purchasing the land and preparing the necessary plans for development should be considered in determining whether it has substantially changed its position in reliance on the existing zoning, at least insofar as such plans are within the perimeter of the proposed changes set forth in the master plans adopted by the City. Both parties conceded that in the two master plans, only a portion of the disputed tract is zoned commercial. Colonial should be charged with notice of these changes. *Avco Community Developers, Inc. v. South Coastal Regional Com.,* 17 Cal. 3d 785, 132 Cal. Rptr. 386, 553 P.2d 546 (1976). And we cannot ignore the uncontroverted affidavit attached in support of Colonial's motion for summary judgment that it paid a $417,105 premium for the subject property because of its commercial zoning.

Notwithstanding this, although there are factual differences, we are of the opinion that the standards promulgated in *Ware v. City of Wichita,* 113 Kan. 153, are controlling. In that case the court found that the adoption of a zoning regulation which prohibited the construction of a building for which a building permit had been issued did not constitutionally impinge upon any vested property rights, since actual construction had not begun.

More recently, in *Houston v. Board of City Commissioners,* 218 Kan. at 332-333, where the landowners contended that they had purchased the property for commercial development, the court cited the holding in *Ware* with approval, and went on to say:

"The court went on to hold that any diminution in the value of the property as a result of the ordinance was immaterial, for '[i]t often happens that a valid exercise of the police power has such effect.' [113 Kan. at 157.] The same considerations apply here. Plaintiffs have taken no action to develop the property and have not changed their position in reliance on the previous zoning beyond the initial step of purchase. In this respect their situation is no different than that of an original owner (or that of Ware) who may find an inchoate scheme for development dashed on the rocks of zoning. Our statutory scheme, in K.S.A. 1974 Supp. 12-709, protects 'existing uses' from subsequent zoning but it does not protect either existing zoning or merely anticipated uses. Plaintiffs must be presumed to have been aware of that when they bought their property.

"Had plaintiffs developed their property for commercial uses or even taken any substantial steps toward such development we would have an entirely different

lawsuit. It might then be akin to the second Kansas case we find persuasive, *Spurgeon v. Board of Commissioners,* 181 Kan. 1008, 317 P.2d 798. In that case this court upheld a Shawnee county zoning resolution which required the removal within two years of auto wrecking yards located in residential zones, even though they were lawful prior nonconforming uses. The two year period was held reasonable in view of the owner's capital investments, and the resolution was held to be a valid exercise of the police power as against the landowners' claim that they were being deprived of their property without due process of law. It appears to us that if a governing body can constitutionally zone an existing business out of existence, it can surely zone against a use which is merely contemplated at some indefinite time in the future.

"We conclude that plaintiffs had no constitutional right to the continuation of the zoning existing at the time they purchased their land."

We conclude that the trial court did not err in ruling that under the circumstances in this case, Colonial did not acquire a vested right to develop the disputed tract in accordance with the zoning existing at the time it purchased the property.

Affirmed.