No. 88,623

MARK CRUMBAKER, *et al.*, *Appellees*, v. HUNT MIDWEST MINING, INC., HUNT MIDWEST REAL ESTATE DEVELOPMENT, INC., and THE ESTATE OF HARRY DARBY, *Appellants*, and CITY OF DE SOTO, KANSAS, *Defendant*.

69 P.3d 601

Opinion filed May 30, 2003.

*Paul G. Schepers*, of Seigfreid, Bingham, Levy, Selzer & Gee, of Kansas City, Missouri, argued the cause, and *Andrea Gould McCarthy* and *Jane L. Williams*, of the same firm, and *Michael G. Norris*, of Norris, Keplinger & Herman, LLC, of Overland Park, were with him on the briefs for appellants.

*John M. Duggan*, of Duggan, Shadwick & Doerr, P.C., of Overland Park, argued the cause, and *William M. Nelson*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

NUSS, J.: Mark Crumbaker and other landowners filed a declaratory judgment action seeking to invalidate the land use provisions in an Annexation Agreement (Agreement) between (1) the City of De Soto (City) on the one side and (2) Hunt Midwest Mining, Inc. (3) Hunt Midwest Real Estate Development, Inc., and (4) the Estate of Harry Darby (sometimes collectively referred to as Hunt

Midwest) on the other side. The controversy centers on the Agreement provisions that allowed Hunt Midwest to maintain and actually expand its Johnson County quarry operations after annexation by the City. The district court granted summary judgment to the landowners, holding that the Agreement changed the land use without following the procedures established in the Kansas planning and zoning statutes at K.S.A. 12-741 *et seq.,* and in the City's own zoning regulations. Since the district court held these procedures were mandatory, it invalidated the Agreement's land use provisions and ruled the annexed land retained its Johnson County agricultural zoning classification. After Hunt Midwest's appeal, we transferred this case from the Court of Appeals under K.S.A. 20-3018(c). The City is not a party to the appeal.

The central issue on appeal is whether the City had the authority to change land use via an annexation agreement and to bypass the provisions of K.S.A. 12-757, as adopted by the City in its zoning regulations. We hold the City had no such authority and affirm the district court. Our analysis requires us to examine three specific issues:

1. What was the zoning status of the quarry land upon annexation?

2. Did Hunt Midwest have a vested right to operate its quarry on the annexed land?

3. Did the Annexation Agreement provide Hunt Midwest with the right to use the quarry land?

Facts

Hunt Midwest Mining, Inc., operates a rock quarry in Johnson County, Kansas, on two adjoining tracts of land leased from Hunt Midwest Real Estate Development, Inc., and the Estate of Harry Darby (quarry land). The quarry land is outside, but contiguous with, the De Soto city limits. The appellees comprise at least 20 per cent of the total number of landowners who own property which is either located inside the city limits and within 200 feet of the quarry land, or outside the city limits and within 1,000 feet of the quarry land. Because the land was zoned agricultural by Johnson County, since January 1991 the quarry had been operating

pursuant to a 10-year conditional use permit (CUP) issued by the Board of County Commissioners. While allowing quarry operations, the CUP restricted them to 377 acres of Hunt Midwest's 770-acre property.

Prior to the January 2001 expiration of the CUP, Hunt Midwest sought its renewal from Johnson County as well as assistance from the county in obtaining a new access road to the quarry. The original access road ran through the Sunflower Army Ammunition Plant, and Hunt Midwest expected the Army to terminate this easement in the near future. When the county refused to assist, Hunt Midwest turned to the City.

In August 2000, Hunt Midwest entered negotiations with the City and not only sought annexation of the quarry land but also assistance in obtaining a new access road. Together with annexation, Hunt Midwest requested rezoning of the land as an industrial district and, consistent with its Johnson County experience, the issuance of a special use permit to allow quarrying. The City considered this proposal unworkable, however, for several reasons. First, the City's zoning regulations only allowed special use permits for quarrying on land zoned "M-1 Industrial - Light District" or "M-2 Industrial - Heavy District." Second, rezoning this land to either light or heavy industrial to allow a special use permit to issue would unfortunately conflict with the City's comprehensive plan that designated future use in this area as lower to moderate density residential. Furthermore, pursuing Hunt Midwest's proposal would subject the site to all current City regulations and require two additional public hearings — one for rezoning and one for the special use permit. As a result, its city planner wrote:

"For these reasons, the City may wish to designate the use as a legal conforming use bound by the conditions set forth in the annexation agreement, thus eliminating the requirement for a special use permit. In addition, [Hunt Midwest Mining] may wish to retain the annexation property's existing County zoning. The City's zoning regulations allow the retention of the County zoning designation upon annexation. As the use of the annexation property is not proposed to change, retaining the County designation would meet the intent of this regulation. These actions would eliminate the need for rezoning, special use permit, review under the joint overlay district regulations [involving Johnson County approval], and the additional public hearings."

The City's zoning district map and its counsel's concessions confirm that Johnson County's zoning designations had been retained upon earlier annexation of properties per the City's zoning regulations. Consistent with the city planner's proposal, the City eventually sought to address the land use issue solely through the Annexation Agreement without following the procedures for rezoning and issuing a special use permit, e.g., without conducting additional public hearings.

Following negotiation of the terms of the Annexation Agreement, on September 7, 2000, Hunt Midwest submitted a consent for annexation petition to the City of De Soto, conditioned upon the City entering the Annexation Agreement. One of its terms authorized the expansion of the rock quarrying onto land not allowed to be quarried under the county's CUP. At the city council's October 5 meeting, the council adopted Resolution 593 via a 3-2 vote, which scheduled a public hearing on the proposed annexation for November 2 and which also directed that notices be sent by certified mail to all property owners located within 200 feet of the land to be annexed. On October 19, the city council passed Resolution 596 via another 3-2 vote which, among other things, requested the city planning commission to review the Agreement at its October 24 meeting and provide the council with its questions or concerns. Per the city council's instructions in the resolution, the planning commission took no evidence or information from the public during its October 24 meeting and made no recommendation to the city council on adopting the Agreement.

One week later, on October 31, Brian Doerr, as legal counsel for a neighborhood group, sent a letter to the city attorney, Patrick Reavey, expressing concerns about the procedures being used to adopt the land use provisions contained in the Annexation Agreement. In particular, Doerr considered Hunt Midwest's request to include not only a request for annexation but also a request for a special use permit. He opined that the special use permit being requested from the City differed substantially from the CUP that had been granted by the county. Among other things, it changed the location of the access road and direction of quarry traffic flow and omitted a continuous and complete reclamation process. Most

importantly, it increased the mining area, which in turn reduced the buffer zone between the mining operations and the land of the adjoining owners. The neighborhood group believed that the City's course of action was inconsistent with the procedures described in the city's zoning regulations. In their view, the correct procedure required the planning commission to fully review the proposed special use permit request and make a recommendation to the city council — and not to merely entertain questions or concerns. The council would then be required to take separate votes on annexation and on the planning commission's recommendation for the special use permit.

On November 2, the city council held a public hearing regarding the annexation petition. Fourteen persons living in the neighborhood of the quarry attended and spoke against the proposed annexation and expansion of operations. Some of their complaints included high noise levels from blasting and other sources, excessive dust, past failures to reclaim and develop the land once the rock had been removed, damage to home foundations, and increased quarry truck traffic.

Two weeks later, on November 16, Doerr faxed a letter to Reavey again objecting to the procedures being used. He reiterated that the neighborhood group believed the City's zoning regulations and Kansas statutes required the city planning commission to hold a public hearing and make a recommendation to the city council on the merits of the issuance of a special use permit. Doerr added that the City zoning regulations and Kansas statutes provided that after the planning commission's recommendation, the adjoining landowners would have the opportunity to file a protest petition. If a protest petition were filed and signed by 20 per cent of the applicable landowners, the issuance of the special use permit could not be approved by the city council unless there were a ¾th majority. Doerr characterized the City's alleged failure to follow the law as the loss of a significant procedural due process right of his clients, *i.e.*, to file a petition protesting the expansion.

Nevertheless, that same day the city council adopted Resolution No. 599, again by a 3-2 vote. It authorized the mayor to enter into the Annexation Agreement subject to certain amendments and

findings of fact and conclusions of law being adopted at a later date. The city council also passed Ordinance No. 1135, which annexed the quarry land. On December 7, 2000, the city council approved the final form of the Agreement, again by a 3-2 vote. The mayor signed the Agreement the next day. Johnson County took no action to prevent the proposed annexation.

Under the 10-year Johnson County CUP, quarry operations had been restricted to within 1,000 feet from the north and south property lines of the quarry and to within 4,000 feet from Kill Creek Road, the quarry's east property line. Under the Annexation Agreement, Hunt Midwest was allowed to expand operations to within 750 feet from the north property line, and essentially to within 3,390 feet from the quarry's east property line. The new area allowed to be quarried totaled approximately 112 acres.

On January 8, 2001, 20 percent of the owners of properties adjoining the quarry land filed the present action against the City and Hunt Midwest Mining, Inc. Among other things, they alleged that the legal effect of the Annexation Agreement was to issue a CUP in violation of Kansas law and the City's own zoning regulations, and that the permit represented a change in land use from that previously allowed by the Johnson County CUP. Hunt Midwest Real Estate Development, Inc., and the Estate of Harry Darby were later added as defendants. After considering cross-motions for summary judgment based upon stipulated facts, the court granted summary judgment to the plaintiff landowners.

Hunt Midwest agrees the City did not consider that its authority to enter the Annexation Agreement and enact the annexation ordinance was derived from the Kansas planning and zoning statutes, K.S.A. 12-741 *et seq*. It also agrees that the City failed to follow zoning procedures in passing the resolution authorizing the mayor to execute the Agreement and failed to follow zoning procedures when it enacted the annexation ordinance authorized by that Agreement.

Analysis

When, as here, a district court has granted summary judgment based on stipulated facts, our review is de novo. *Bolz v. State Farm Mut. Auto. Ins. Co.*, 274 Kan. 420, 423, 52 P.3d 898 (2002).

Issue 1: *What was the zoning status of the quarry land upon annexation?*

Hunt Midwest first contends that the annexation washed the quarry land clean of any Johnson County zoning classification and that it came into the City without any zoning restrictions. Hunt Midwest further argues that as a result, so long as it did not operate as a nuisance, it was free to use the quarry land in any manner it chose. Accordingly, no zoning statutes or regulations needed following and no City special use permit needed issuing.

The Court of Appeals addressed this "cleansing" issue in *Colonial Investment Co. v. City of Leawood*, 7 Kan. App. 2d 660, 646 P.2d 1149 (1982). There, like Hunt Midwest in the instant case, the City of Leawood contended that property loses its zoning classification upon annexation and comes into the city unzoned. Colonial, however, contended that annexed property retains its zoning classification until rezoned by the city. The court acknowledged that other jurisdictions have taken differing approaches to this issue, but analyzed the problem by stating:

"The trial court adopted the position expressed in *Dahman* [*Dahman v. City of Ballwin*, 483 S.W.2d 605 (Mo. App. 1972)], that a change in the boundaries of sovereigns should have but a minimal effect on zoning ordinances which govern the conduct of landowners, and that the soundest way to protect property of zoning is to require that property retains its zoning classification upon annexation until rezoned.

"Kansas statutes regarding zoning are found at K.S.A. 12-701 *et seq.*, for cities and joint committees of city and county planning boards, and at K.S.A. 19-2901 *et seq.*, for counties and townships. K.S.A. 19-2925a reads in pertinent part as follows:

'(A)ny zoning resolution adopted by any county under the provisions of the act of which this act is amendatory shall continue in force and effect the same as though adopted under the provisions of this act, until the same is modified or a new plan or part thereof . . . or zoning resolution is adopted as provided in this act.'

"This section was passed into law in 1965. At the same time the legislature passed an identical section with respect to the duration of zoning adopted by cities, K.S.A. 12-715a. See also K.S.A. 12-705a, 12-706a.

"Although these statutes do not deal directly with the issue of zoning, they do indicate the legislature's underlying policy that stable land uses are beneficial to

the public welfare and that such stability is enhanced by continuity of zoning." 7 Kan. App. 2d at 665.

Although this analysis was not determinative of *Colonial Investment's* ultimate disposition, we find it persuasive and adopt it here. The policy of this State, as initially established and later revalidated by the legislature, reveals that stable land uses are beneficial to the public welfare and that stability is enhanced by continuity of zoning. The 1965 planning and zoning laws discussed in *Colonial Investment* were repealed in 1991, but the legislature chose to reaffirm the continuity expressed there when it passed the successor statutes. K.S.A. 12-762(a) states in relevant part:

"(a) Any comprehensive plan or part thereof, subdivision regulations, zoning regulations or building or setback lines adopted by the governing body or planning commission of any city or county adopted prior to January 1, 1992, and which are consistent with the provisions of this act shall continue in force and effect the same as though adopted under the provisions of this act, until the same is modified or a new comprehensive plan or part thereof, subdivision or zoning regulations or building or setback lines are adopted as provided in this act."

We therefore hold that the soundest way to protect continuity of zoning of property is to require that property retain its zoning classification upon annexation. See *Maricopa County Bd. of Super. v. Bell 51st Investors*, 108 Ariz. 261, 495 P.2d 1315 (1972); *Barr v. Chesterfield City Council*, 904 S.W.2d 27 (Mo. App. 1995); *Dahman v. City of Ballwin*, 483 S.W.2d 605 (Mo. App. 1972). Moreover, our holding does not deprive the City of anything. "It retains its sovereign right to rezone the property at any time after annexation, or to delineate the proposed use through affirmative zoning action at the time of annexation." 7 Kan. App. 2d at 665. De Soto's own zoning regulations provide additional flexibility, *i.e.*, the planning commission's public hearing regarding a proposed zoning change may even be held prior to annexation.

In contrast, to adopt Hunt Midwest's cleansing argument would abruptly deprive the quarry's neighboring landowners of the protection and certainty they have received from Johnson County zoning and its accompanying restrictions for the past 10 years. See *Dahman v. City of Ballwin*, 483 S.W.2d 605 (Mo. App. 1972); *cf.*

*Koppel v. City of Fairway,* 189 Kan. 710, 371 P.2d 113 (1962) (Owners of residential property in the City of Roeland Park, which adjoined the property in the City of Fairway that was being rezoned from residential to retail business, were entitled to join a statutorily-authorized protest petition against Fairway because they had benefitted from Fairway's past zoning ordinance, were entitled to the enjoyment of their property, and were now directly and harmfully affected by the rezoning ordinance.). Consequently, any loss of the neighbors' protection and certainty in the instant case should only be the result of affirmative action by the City through its zoning process, not the automatic result of the City's failure to take zoning action.

Hunt Midwest argues that since the City has no agricultural zone, the quarry land cannot carry its county agricultural zoning classification into the City once annexation occurs. This argument, however, is contradicted by the City's own zoning regulations adopted on March 16, 2000, which state in art. 3, ¶ 7:

"Annexed Land: All land which may hereafter be annexed to the City of De Soto *shall retain its existing rural (Johnson County or Township) zoning district classification, and shall be re-classified only after a public hearing by the Planning Commission and recommendation to the Governing Body* as provided in these regulations for zoning district amendments. The public hearing by the Planning Commission to adopt a recommendation may be held prior to annexation of the subject parcel of land to the City." (Emphasis added.)

The De Soto city planner himself contradicts Hunt Midwest's position. When considering Hunt Midwest's first proposal, he recommended instead that Hunt Midwest retain the property's existing county zoning pursuant to these City regulations. Moreover, the City's past practices belie Hunt Midwest's position. The City's zoning district map and counsel statements reveal that the Johnson County zoning had been retained upon annexation of earlier properties per these regulations.

The quarry land annexed by the City retains its Johnson County agricultural zoning classification and any accompanying land use restrictions until the City changes the zoning.

Issue 2: *Did Hunt Midwest have a vested right to operate its quarry on the annexed land?*

Hunt Midwest next argues that because of the "diminishing asset rule" it has a vested right to conduct quarry operations over its entire property, not just the area permitted by Johnson County. Consequently, the City has no authority to limit this right, through a zoning ordinance or otherwise. As support it cites *County of Du Page v. Stone Co.*, 18 Ill. 2d 479, 165 N.E.2d 310 (1960), and *Sturgis v. Winnebago Adjustment Bd.*, 141 Wis. 2d 149, 413 N.W.2d 642 (1987).

This argument requires a review of the law on existing or nonconforming use. From its beginning, the concept of zoning has been based upon the belief that some uses of land were incompatible with others and that such land could be more efficiently used if the uses were separated. *Goodwin v. City of Kansas City*, 244 Kan. 28, 32, 766 P.2d 177 (1988). In most instances, the land to be zoned was already in use. Consequently, "[f]or legal and political reasons, zoning drafters avoided confrontation with these landowners by permitting existing uses to continue, but reduced their life expectancy by limiting the landowners' right to change, expand, or recommence after abandonment, with minimal exceptions." 244 Kan. at 32 (citing 1 Anderson, American Law of Zoning § 6.04, [2d ed. 1976]); see *Union Quarries, Inc. v. Board of County Commissioners*, 206 Kan. 268, 478 P.2d 181 (1970). We have defined such an "existing" or "nonconforming use" as "a lawful use of land or buildings which existed prior to the enactment of a zoning ordinance and which is allowed to continue despite the fact it does not comply with the newly enacted use restrictions." *Johnson County Memorial Gardens*, 239 Kan. at 224.

Consistent with this policy of restriction and eventual elimination, courts have ruled that the right to a nonconforming use is to be strictly construed and that the burden of proof is on the party claiming the nonconforming use. Most importantly, such a party must establish that the nonconforming use commenced prior to the enactment of the ordinance restricting such use. Accordingly,

a use which from its inception violated a zoning ordinance has no lawful right to continue. *Goodwin,* 244 Kan. at 32-33.

If a nonconforming use is established, however, the party has a vested right which is protected by due process. 244 Kan. at 32. The party further possesses the right to enjoin enforcement of a zoning action directed against such use. See *Union Quarries, Inc.,* 206 Kan. 268, Syl. ¶ 2. The nonconforming use doctrine is codified at K.S.A. 12-758, which states in relevant part:

"(a) Except as otherwise provided by this section and K.S.A. 12-770 and 12-771, and amendments thereto, *regulations adopted under authority of this act shall not apply to the existing use of any building or land,* but shall apply to any alteration of a building to provide for a change in use or a change in the use of any building or land after the effective date of any regulations adopted under this act." (Emphasis added.)

While we acknowledged in *Goodwin* that zoning drafters limit the life expectancy of nonconforming uses by restricting the landowners' right to expand the use, an exception is the diminishing asset doctrine, generally applicable to mining or quarrying operations. The basis for the doctrine is a recognition that the land itself is a resource consumed during operations. While the entire land is an integral part of the operation, the doctrine acknowledges that excavation cannot occur simultaneously on the whole of the land. Therefore, if there were evidence of an intent to expand excavation to any other portion of the land at the time the zoning laws had been been implemented, expanded excavation is not considered an unlawful nonconforming use. See 83 Am. Jur. 2d, Zoning and Planning § 586. An examination of Hunt Midwest's cited authority reveals that in each case the diminishing asset rule was applied to expansion of a legal nonconforming use. See *County of Du Page,* 18 Ill. 2d at 484; *Sturgis,* 141 Wis. 2d at 154.

By contrast, Hunt Midwest cites no record evidence proving that it ever operated the quarry as a legal nonconforming use, *i.e.,* that its quarry use lawfully existed prior to the enactment of the Johnson County zoning ordinance. See *Johnson County Memorial Gardens,* 239 Kan. at 224. Instead, the evidence in the record clearly reveals the quarry was in an agricultural zoned area and was only allowed to operate via the authority of the 10-year CUP granted by the

county in 1991. See 83 Am Jur. 2d, Zoning and Planning § 755 (Most courts distinguish sharply between a conditional use and a nonconforming use.). The record evidence also reveals that Hunt Midwest apparently allowed the county to confine quarrying operations to certain portions of its land through setbacks, and that its initial proposal to the City included a request for rezoning and a special use permit to conduct expanded operations. These past actions by Hunt Midwest contradict its present argument that it possessed a vested right to operate an expanded quarry without restriction by the City.

In summary, Hunt Midwest fails to meet its burden. See *Goodwin,* 244 Kan. at 34; *M.S.W., Inc. v. Marion County Bd. of Zoning Appeals,* 29 Kan. App. 2d 139, 144, 147, 24 P.3d 175 (2001). Accordingly, Hunt Midwest has no right to conduct its quarrying operation over its entire property and no vested right to be free from zoning restrictions that would properly be instituted by the City.

Issue 3: *Does the Annexation Agreement provide Hunt Midwest with the right to use the quarry land?*

For Hunt Midwest's last argument, it contends that through the authority of the Kansas annexation statutes and the City's home rule powers under the Kansas Constitution, the Annexation Agreement provides the right to quarry on the land. Accordingly, the zoning statutes and regulations may be ignored.

Examining these questions requires a short review of zoning. In *Ware v. City of Wichita,* 113 Kan. 153, 214 Pac. 99 (1923), we not only held the State's first enabling legislation for zoning to be constitutional, but we also concluded that "there is good ground for the view that a reasonable zoning ordinance has some pertinent relation to the health, safety, morals and general welfare of the community." 113 Kan. at 160. Some form of enabling legislation for zoning has been in effect in Kansas ever since the initial Act in 1921, and the present Act, K.S.A. 12-741 *et seq.,* reveals that the basic purpose of zoning laws in this State has remained constant: "for the protection of the public health, safety and welfare." K.S.A. 12-741(a). Moreover, the Act acknowledges an emphasis on land use regulation since it defines "zoning" as "the regulation or re-

striction of the location and uses of buildings and uses of land."
K.S.A. 12-742(10).

Nevertheless, Hunt Midwest contends that the absence of any
zoning prohibition in our annexation statutes, K.S.A. 12-519 *et seq.*,
provides implicit authority to change land uses through annexation
agreements as well. Kansas annexation statutes, however, concern
boundary changes with no mention of land use changes. Moreover,
the annexation statutes and the zoning statutes serve much differ-
ent purposes. Instead of protecting the public's right to health,
safety, and welfare, the purpose of the annexation statutes is to
protect the rights of the landowners against unilateral action by a
city in annexing *their* land. *City of Lenexa v. City of Olathe*, 233
Kan. 159, 164, 660 P.2d 1368 (1983).

Despite these fundamental differences in purpose, Hunt Mid-
west points to other jurisdictions that appear to allow zoning pro-
visions, either in or in conjunction with annexation proceedings.
See *Meegan v. Vil. of Tinley Park*, 52 Ill. 2d 354, 288 N.E.2d 423
(1972), and *Burt v. City of Idaho Falls*, 105 Idaho 65, 665 P.2d
1075 (1983). Illinois law, however, expressly provides that zoning
is a permissible subject of annexation agreements. *Meegan*, 52 Ill.
2d at 357. Additionally, the court in *Burt* gives no indication what
procedures were used when the annexed land in question was
zoned, but does suggest that required zoning procedures were fol-
lowed. 105 Idaho at 66, 68.

More important than the limited guidance of these foreign ju-
risdictions, however, is the guidance provided by additional Kansas
law. Specifically, we first observe that the power of a municipality
to alter its boundaries by annexation is vested absolutely and ex-
clusively in the legislature, and this power is therefore completely
controlled by statute, *i.e.*, K.S.A. 12-519 *et seq.*; see Kansas Const.
art. 12, § 5(a); *City of Lenexa*, 233 Kan. at 165; *Claflin v. Walsh*,
212 Kan. 1, 7, 509 P.2d 1130 (1973). We next observe that the
planning and zoning power of a municipality is derived solely from
the grant contained in K.S.A. 12-741 *et seq.*, and this Act defines
zoning as the regulation or restriction of the uses of land. See
K.S.A. 12-742(10); *Johnson County Memorial Gardens*, 239 Kan.
at 224. Finally, we observe that K.S.A. 12-519 *et seq.* contains no

mechanism whatsoever to change zoning of land sought to be annexed into a city, while K.S.A. 12-741 *et seq.* contains detailed procedures to change zoning, *i.e.*, to regulate or restrict land use, that appear to be applicable to virtually every situation.

Most persuasively, we observe that the City's own regulations clearly provide that: "The City *shall* regulate land use as provided by K.S.A. 12-741, *et seq.*" City of De Soto Zoning Regulations, Art. 14, ¶ 1. (Emphasis added.) We therefore conclude that according to the legislature, and as evidenced by the City's own actions, the basic power to regulate or restrict land use in this case derives entirely from the authority found in the zoning statutes, to the exclusion of the annexation statutes. Consequently, the Annexation Agreement is not empowered by Kansas annexation statutes to change land use.

Notwithstanding this holding, Hunt Midwest maintains that the procedures set forth in the Kansas zoning statutes are not mandatory and may be bypassed pursuant to the City's home rule powers under the Kansas Constitution art. 12, § 5(a). The main problem with this argument is that the City's own regulations clearly provide that it *shall* regulate land use as provided by the zoning statutes, K.S.A. 12-741 *et seq.* Moreover, pursuant to this enabling legislation, the City has passed its own ordinances and adopted regulations which detail the procedures to be followed when regulating land use and which must be consistent with the provisions of the Act. See K.S.A. 12-741. Hunt Midwest is therefore precluded from relying upon the home rule doctrine in the instant case. As we stated in *Moore v. City of Lawrence*, 232 Kan. 353, 357, 654 P.2d 445 (1982), when discussing the predecessor statute to K.S.A. 12-741:

"While the application of the statutes may be optional, it is clear that once a city chooses to adopt this method the legislature intended for those statutes . . . to be binding. . . . If each city which elected to create a planning commission under the provisions of 12-701 *et seq.*, were allowed, by way of charter ordinance, to determine which of the provisions were not applicable to that city, *the purpose and effect of the statute, to provide a comprehensive method for the governance of city planning and subdivision regulation, would be seriously impaired.* We do not think such a result was intended by the legislature and therefore hold these

statutes are uniformly applicable to all cities which elect to follow the procedure set forth therein." (Emphasis added.)

See also *Kansas City Renaissance Festival Corp. v. City of Bonner Springs,* 269 Kan. 670, 673, 8 P.3d 701 (2000) ("[H]ome rule power does not authorize cities to act where the state legislature has precluded municipal action by clearly preempting the field with a uniformly applicable enactment."); *Johnson County Memorial Gardens,* 239 Kan. at 224. (City's planning and zoning power is derived from the grant contained in the zoning statutes.).

As a result, we have long held that the power of a city government to change the zoning of property — which includes issuing special use permits — can only be exercised in conformity with the statute which authorizes the zoning. *Ford v. City of Hutchinson,* 140 Kan. 307, 311, 37 P.2d 39 (1934). In the instant case, some landowners did not receive proper notice of the proposed action as required by K.S.A. 12-757(b). The City only sent notices to those owning property within 200 feet of the annexed land, not 1,000 feet. Proper notice is mandatory and must be complied with to give the planning commission authority to recommend action, and the city commission jurisdiction to act. See *Carson v. McDowell,* 203 Kan. 40, 43-44, 452 P.2d 828 (1969); *Ford v. City of Hutchinson,* 140 Kan. at 311.

The public, particularly the adjoining landowners, did not receive a real hearing in front of the planning commission as required by K.S.A. 12-757(b) since the city council prohibited it from receiving evidence or information from the public. Additionally, no recommendation was made by the planning commission to the city council as required by K.S.A. 12-757(b). A planning commission recommendation, either for or against adoption of the proposed change, is a prerequisite to the city council's right to approve the proposal. See *Reeves v. Board of Johnson County Comm'rs,* 226 Kan. 397, 403, 602 P.2d 93 (1979). Moreover, without a real hearing by the planning commission, the possibility of a "no recommendation" was eliminated, and along with it the requirement of a ⅔ vote of the city council to override the disapproval. See K.S.A. 12-757(d).

Finally, the adjoining landowners did not receive the opportunity to file a protest petition, which in turn deprived them of the right to require the city council to approve the expansion/permit by a ¾ vote as set forth in K.S.A. 12-757(f). Consequently, this procedural failure is also fatal. See generally *Koppel v. City of Fairway,* 189 Kan. 710, 371 P.2d 113 (1962). Most importantly, all the significant votes by the city council regarding Hunt Midwest were 3-2, which demonstrates that the lost opportunity for the protest petition was not merely an academic point. Rather, its loss is dispositive of the main issue, *i.e.,* the measures would have failed.

In short, because the City's failure to follow the zoning procedures in state law and in city ordinances and regulations renders its action invalid, the Annexation Agreement provisions that deal with land use, *e.g.,* the continuation and expansion of the quarrying operations, must be invalidated. See *City of Manhattan v. Ridgeview Building Co., Inc.,* 215 Kan. 606, 615, 527 P.2d 1009 (1974).

The district court is affirmed.