No. 98,487

ROGER ZIMMERMAN, *et al.*, *Appellants/Cross-appellees*, and A.B. HUDSON and LARRY FRENCH, *Intervenors/Appellants/Cross-appellees*, v. BOARD OF COUNTY COMMISSIONERS OF WABAUNSEE COUNTY, KANSAS, *Appellees/Cross-appellants*.

(264 P.3d 989)

Opinion filed October 21, 2011.

*Charles C. Steincamp*, of Depew Gillen Rathbun and McInteer, L.C., of Wichita, argued the cause and was on the brief for appellants/cross-appellees Roger Zimmerman, *et al.*

*Scott A. Grosskreutz*, of Cavanaugh and Lemon, P.A., of Topeka, argued the cause and was on the brief for the intervenors/appellants/cross-appellees A.B. Hudson and Larry French.

*William L. Frost*, of Morrison, Frost, Olsen, Irvine, Jackson and Schartz, L.L.P., of Manhattan, argued the cause, and *Katharine J. Jackson*, of the same firm, was with him on the brief for appellee/cross-appellant Board of Wabaunsee County Commissioners.

*Richard H. Seaton*, of Seaton, Seaton and Gillespie, L.L.P., of Manhattan, was on the brief for *amici curiae* Audubon of Kansas and the Kansas Wildlife Federation.

*Michael D. Irvin* and *Charles Arthur*, of Kansas Farm Bureau, of Manhattan, were on the brief for *amicus curiae* Kansas Farm Bureau.

*Neil R. Shortlidge*, of Stinson Morrison Hecker, L.L.P., of Overland Park, *Donald L. Moler, Jr.*, and *Sandra L. Jacquot*, of League of Kansas Municipalities, of Topeka, and *Melissa Wangemann*, of Kansas Association of Counties, of Topeka, were on the brief for *amici curiae* League of Kansas Municipalities and Kansas Association of Counties.

*Alan Claus Anderson*, of Husch Blackwell Sanders, L.L.P., of Kansas City, Missouri, and *Derek T. Teeter*, of the same firm, were on the brief for *amicus curiae* NextEra Energy Resources, L.L.C.

*Patrick B. Hughes*, of Adams Jones Law Firm, P.A., of Wichita, and *Michael J. Davis*, of the University of Kansas School of Law, of Lawrence, were on the brief for *amicus curiae* Protect the Flint Hills, Inc.

*Frank A. Caro, Jr.* and *Kevin J. Breer*, of Polsinelli Shughart, P.C., of Overland Park, and *Timothy S. Bishop* and *J. Bishop Grewell*, of Mayer Brown, L.L.P., of Chicago, Illinois, were on the brief for *amicus curiae* The Wind Coalition.

The opinion of the court was delivered by

NUSS, J.: This case involves a decision by the Board of County Commissioners of Wabaunsee County (Board) to amend its zoning regulations. Specifically, the Board permitted Small Wind Energy Conversion Systems (SWECS) but prohibited the placement of Commercial Wind Energy Conversion Systems (CWECS, *i.e.*, commercial wind farms) in the county. Plaintiffs are owners of land in the county. They were later joined by plaintiff intervenors (Intervenors), who are not landowners but owners of purported wind rights in the county.

The district court granted the Board's various dispositive motions. Plaintiffs and Intervenors appealed, and the Board cross-appealed. Pursuant to K.S.A. 20-3017, we transferred the case from the Court of Appeals.

In *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 218 P.3d 400 (2009) (*Zimmerman I*), we affirmed the district court's decision on several issues. We specifically held that the district court did not err (1) in determining that the Board's decision to amend the zoning regulations was lawful; (2) in determining the Board's decision to amend was reasonable; (3) in precluding Plaintiffs and Intervenors from conducting further discovery on the issue of reasonableness; (4) in dismissing the claim that the Board's decision violated the Contracts Clause of the United States Constitution; (5) in dismissing the claims that the zoning regulation amendments were preempted by state and federal law; and (6) in determining that Intervenors' action was commenced in a timely manner.

Concurrent with the release of *Zimmerman I*, we ordered the parties to submit supplemental briefs on certain questions raised in the issues originally presented on appeal by both Plaintiffs and Intervenors. Those general issues, presently before us for review after the parties' supplemental oral arguments, focus on whether the district court erred in deciding as a matter of law that the Board did not violate the Takings Clause or the Commerce Clause of the United States Constitution.

Our order requiring supplemental briefing on the Takings and Commerce Clauses necessarily stayed our resolution of two issues

originally presented on appeal by Intervenors: whether the district court erred in dismissing their claims (1) under 42 U.S.C. § 1983 (2006) and (2) for inverse condemnation.

The first issue on appeal and our holding is as follows:

1.  Did the district court err by disposing of the Takings Clause claim as a matter of law? No.

Because there was no taking, the district court did not err in also disposing of Intervenors' related takings-based claim under 42 U.S.C. § 1983 and their claim for inverse condemnation.

The second issue on appeal and our holding is as follows:

2.  Did the district court err in dismissing the Commerce Clause claim as a matter of law? We hold there was no discrimination against interstate commerce. However, the claim alleging the Board's decision placed incidental burdens on interstate commerce that outweighed the benefits is remanded to the district court for analysis under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970).

Because Intervenors also made a burden-based claim under the Commerce Clause in their 42 U.S.C. § 1983 contention, that specific claim also is remanded.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Many of our facts come from *Zimmerman I.* Plaintiffs are owners of land in Wabaunsee County who have entered into written contracts for the development of commercial wind farms on their properties. Intervenors are not landowners but through various contracts are owners of purported wind rights concerning other properties in the county.

Defendant is the three-member Board of County Commissioners of Wabaunsee County. The county is roughly 30 miles long and 30 miles wide, containing approximately 800 square miles and 7,000 people. It is located in the Flint Hills of Kansas, which con-

tain the vast majority of the remaining Tallgrass Prairie that once covered much of the central United States.

On October 28, 2002, the county zoning administrator told the Board that he had been contacted by a company desiring to build a wind farm in the county. At that time, the county had no zoning regulations relating specifically to wind farms. However, Article 2 of the county's zoning regulations captioned "Agricultural District Regulations," did generally provide:

"The purpose of this [Agricultural] District is to provide for a full range of agricultural activities on land used for agricultural purposes, . . . and at the same time offer protection to land used for agricultural purposes from the depreciating effect of objectional, hazardous, incompatible and unsightly uses. The District is also intended to protect watersheds and water supplies; to protect forest and scenic areas; to conserve fish and wildlife habitat . . . ."

According to the Board, establishing wind farms first would have required the granting of conditional use permits to allow for the height of the wind turbine structures, *i.e.*, permission was not automatic but within the Board's discretion.

On November 12, 2002, the Board adopted a resolution placing a temporary moratorium on the acceptance of applications for conditional use permits for wind farm projects. The resolution provided, among other things, that during the moratorium the zoning administrator was to undertake a comprehensive review of both the current zoning regulations and wind farm projects, including the impact, if any, that such projects might have upon nearby properties. This moratorium, valid for 120 days upon publication, was later extended on at least five occasions.

The following month, December 2002, the county planning commission conducted its first public meeting to discuss amending zoning regulations regarding commercial wind farms.

According to Plaintiffs' briefs, in April 2003 8 of the 12 Plaintiffs individually entered into "Amended and Restated Wind Farm Easement[s]" with J.W. Prairie Wind Power, L.L.C. for the purpose of providing for the development of CWECS on their respective properties. These include Plaintiffs Roger and Angelina Zimmerman, Harris and Virginia Zimmerman, Bill and Linda Unruh, and Robert and Janet Goss.

According to Plaintiffs' briefs, in June 2003 two more Plaintiffs, Kenneth and Colleen Anderson, individually entered into the same agreement with J.W. Prairie Wind Power for the purpose of providing for the development of CWECS on their property.

On July 24, 2003, the planning commission held a public hearing for discussion of the proposed zoning regulations, which included regulations of small and commercial wind farms. A month later, the Board ordered the planning commission to review and recommend updates to the 1974 Wabaunsee County Comprehensive Plan (Plan) because the Plan did not address changes that had occurred in the county in intervening years. After the Plan had been reviewed, the Board intended to consider the new proposed regulations regarding wind turbines.

On February 15, 2004, after input from the public, including a county-wide survey and focus groups, the planning commission formally recommended the adoption of the revised Comprehensive Plan 2004.

Eight days later, on February 23, the Board again voted to extend the wind farm moratorium, this time from March 31 to June 30, 2004, "to allow adequate time to complete a full study of the issues involved with wind energy conversion systems." The Board again directed—this time that prior to July 1—the county zoning administrator "shall not accept nor process applications for conditional use permits for wind energy conversion systems."

On March 1, 2004, the two Intervenors, A.B. Hudson and Larry French, were each the named "second party" in two separate documents entitled, "Corporation General Warranty Deed and Grant of Easement" signed by the first party, Workingman's Friend Oil, Inc. Among other things, the documents state they entitle Intervenors to:

"[1] [t]he exclusive and complete rights, titles, interest, and privileges in all the wind and air above and passing through the land, along with all related easements and covenants . . . and all right, title, and interest to develop or grant wind rights, wind easements, wind leases, . . . and [2] all rights to construct or cause to be constructed and operate through third party contracts, wind farms with related improvements . . . ."

According to Plaintiffs' briefs, on March 10, 2004, the final two Plaintiffs, Glen Eberle and Wilson Valley, L.L.C., entered into the

same agreement as the other 10 Plaintiffs with J.W. Prairie Wind Power to develop CWECS on their respective properties. None of these agreements between Plaintiffs and J.W. Prairie Wind Power are in the record on appeal.

The next month, on April 26, 2004, the Board adopted the planning commission's recommended changes to the Plan and adopted the Comprehensive Plan 2004. It included the goals and objectives previously recommended to the Board. The Comprehensive Plan 2004 provides in relevant part that the county would endeavor to:

A. Establish an organized pattern of land use with controlled and smart growth that brings prosperity to the county while also respecting its rural character.
B. Maintain the rural character of the county with respect to its landscape, open spaces, scenery, peace, tranquility, and solitude.
C. Develop moderate and slight growth of businesses, industries, and services with small-scale employment.
D. Develop realistic plans to protect natural resources such as the agricultural land, landscape, scenic views, and Flint Hills through regulatory policies.
E. Promote historic preservation, which protects and restores historic properties, old limestone buildings, and landmarks in the county.
F. Attract small retail businesses and encourage clustering of retail and service businesses.
G. Improve school system and other public utilities to address the existing deficiencies and needs.
H. Develop tourism programs involving historic properties, nature of rural character, and scenic landscape.
I. Provide affordable and good quality housing with respect to current deficiencies and future needs.
J. Attract new population, a stronger labor force, and retain youth.

The next month, on May 20, 2004, after the Board's adoption of the Comprehensive Plan, the planning commission held a public hearing to discuss proposed amendments to the zoning regulations regarding small and commercial wind farms. At its next meeting, the commission voted 8-2 to recommend that the Board approve the proposed zoning amendments which would specifically allow CWECS as a conditional use, subject to certain conditions.

According to the briefs of the two Intervenors, on June 19, 2004, they entered into "Wind Option Agreements" with Zilkha Renewal Energy, LLC. These agreements are not in the record on appeal, but Intervenors imply Zilkha is a developer that would use their

purported wind rights to produce commercial wind energy on the realty of Working Man Oil, Co.

On June 28, the Board voted 2-1 to adopt in part and override in part the planning commission's recommended zoning changes. Specifically, the Board adopted the commission's recommendations regarding regulation of Small Wind Energy Conversion Systems (SWECS, *i.e.*, small wind farms). It rejected, however, the commission's recommendations regarding regulation of CWECS by absolutely prohibiting CWECS in the county.

The Board's decision was formally reflected in Resolution No. 04-18, passed 2 weeks later on July 12, 2004. The Resolution articulated the following basis for the Board's decision:

"The basis of the amendments to the Zoning Regulation is that Commercial Wind Energy Conversion Systems would not be in the best interests of the general welfare of the County as a whole. They do not conform to the intent and purpose of the Zoning Regulations. In light of the historical, existing and anticipated land uses in the County, they would adversely affect the County as a whole. They would be incompatible with the rural, agricultural, and scenic character of the County. They would not conform to the Wabaunsee County Comprehensive Plan, including the goals and objectives that were identified by the citizens of the County and incorporated as part of the Plan. They would be detrimental to property values and opportunities for agricultural and nature based tourism. Each reason stands on its own. This motion is based upon what has been presented at public hearings, public meetings, letters and documents that have been produced, as well as experience and personal knowledge of the issues involved."

The Resolution also added the following definitions to Article 1-104 of the zoning regulations adopted in 1995:

"207. Wind Energy Conversion System (WECS). The combination of mechanical and structural elements used to produce electricity by converting the kinetic energy of wind to electrical energy. Wind Energy Conversion systems consist of the turbine apparatus and any buildings, roads, interconnect facilities, measurement devices, transmission lines, support structures and other related improvements necessary for the generation of electric power from wind.

"208. *Commercial Wind Energy Conversion System*: A Wind Energy Conversion System exceeding 100 kilowatt or exceeding 120 feet in height above grade, or more than one Wind Energy Conversion System of any size proposed and/or constructed by the same person or group of persons on the same or adjoining parcels or as a unified or single generating system. (*Commercial Wind Energy Conversion Systems are specifically prohibited as a use in Wabaunsee County.*) . . . .

. . . .

"210. Small Wind Energy Conversion System. A wind energy conversion system consisting of wind turbine, a tower, and associated control or conversion electronics, which has a rated capacity of not more than 100 kilowatt, which is less than 120 feet in height and which is intended solely to reduce on-site consumption of purchased utility power." (Emphasis added.)

A new paragraph (30) also was added to Article 31-105. It reiterated that CWECS were prohibited in Wabaunsee County and certainly would not be permitted as a conditional use:

"30. Commercial Wind Energy Conversion Systems are *not a use that may be approved or permitted as a Conditional Use in Wabaunsee County* and are specifically prohibited." (Emphasis added.)

Article 31-109 was also amended to include parameters for SWECS. These restrictions included a minimum parcel size (no system shall be located on a parcel of less than 20 contiguous acres); density (no more than one system shall be located on each 20 acres of parcel); spacing (no system may be located within 300 feet of another system or a commercial wind energy conversion system); setback (a setback from the nearest property line a distance equal to twice the height of the system, including the rotor blades and a setback from the nearest public road right-of-way a distance equal to the height of the system, including the rotor blades, plus an additional 50 feet); blade height (the lowest point of the rotor blades shall be at least 50 feet above ground level at the base of the tower); and advertising restrictions (no advertising of any kind shall be located on the system).

Article 31-112 (Prohibited Uses) was also amended to include a new paragraph (5) concerning CWECS. It reiterated that such systems were prohibited in the county and any application for their use would not be considered:

"5. No Commercial Wind Energy Conversion System, as defined in these Regulations, shall be placed in Wabaunsee County. No application for such a use shall be considered."

Plaintiffs sued the Board in district court, seeking a judicial declaration that the Board's action in passing Resolution No. 04-18 be

null and void. Plaintiffs also sought damages under a number of different theories.

Without filing an answer, the Board filed a motion to dismiss. In decisions dated February 23 and July 22, 2005, the district court, Judge Klinginsmith, dismissed five of Plaintiffs' claims. These were Count I (state preemption); Count II (failure to follow proper procedures under K.S.A. 12-757[d] in adopting Resolution 04-18); Count IV (violation of the Contract Clause of the United States Constitution); Count V (violation of the Commerce Clause of the United States Constitution); and Count VI (federal preemption). Judge Klinginsmith reserved judgment on the remaining Count III (unconstitutional taking) and Count VII (42 U.S.C. § 1983) holding that their consideration was premature until the court could determine the reasonableness under K.S.A. 12-760 of the Board's adoption of the resolution amending the zoning regulations. He ordered the Board to provide the record of the proceedings where it considered and adopted the resolution.

On August 7, 2005, after court approval, Intervenors filed their petition. Their claims duplicated all of those brought by Plaintiffs, but Intervenors also brought a claim for inverse condemnation. Despite this new petition, the district court refused to reconsider its earlier rulings dismissing those Plaintiffs' claims now also brought by Intervenors.

On October 12, 2006, Judge Ireland, as successor to the now-retired Judge Klinginsmith, remanded the matter to the Board. Judge Ireland acknowledged the findings of fact and conclusions the Board provided. He found, however, the Board had not met its responsibility to produce evidence that it had acted reasonably. While maintaining its position that it had sufficiently complied, on November 16, 2006, the Board supplemented the record with additional findings of fact.

After finding the Board now had identified each fact it relied upon in making its zoning decision, on February 28, 2007, Judge Ireland then dismissed Plaintiffs' and Intervenors' three remaining claims based upon unreasonableness, taking, and 42 U.S.C. § 1983. He also dismissed Intervenors' claim of inverse condemnation.

After our decision in *Zimmerman I*, the following issues remain for our resolution: the Takings Clause and the Commerce Clause of the United States Constitution, 42 U.S.C. § 1983, and inverse condemnation.

More facts will be added as necessary to the analysis below.

## ANALYSIS

Issue I: *The district court did not err by disposing of the Takings Clause claim as a matter of law.*

Plaintiffs and Intervenors both contend the Board's decision to amend the zoning regulations constituted a compensable taking under the Fifth Amendment to the United States Constitution and that Judge Ireland erred in holding as a matter of law that no taking occurred. Because Judge Ireland disposed of their claim partly based upon his determination of the reasonableness of the Board's action—which itself considered matters outside the pleadings—the takings disposition is characterized as summary judgment. See K.S.A. 60-212(b)(6); *Perry v. Board of Franklin County Comm'rs*, 281 Kan. 801, Syl. ¶ 1, 132 P.3d 1279 (2006).

We ordered the parties in their supplemental briefing to thoroughly analyze the particular nature of the rights allegedly taken—from landowners and from nonlandowners alike. In their initial brief, Plaintiffs only allege a taking of their lease rights with J.W. Prairie Wind Power, LLC, to develop CWECS on their realty. In their supplemental brief, Plaintiffs also appear to allege a taking of a second interest: one "in the wind resources that flow across their properties."

Unlike Plaintiffs, Intervenors are not realty owners. Based upon their documents from Workingman's Friend Oil, Inc. ("deeds and grants of easements" which are in the record) and those from Zilkha Renewal Energy, LLC (which are not in the record but are denominated "wind option agreements"), they also appear to claim two interests were taken. First, through Workingman they claim severed wind estates, including the right to construct and operate commercial wind farms. Second, through Zilkha they claim contractual interests to utilize the wind rights, *i.e.*, in the commercial development of wind power.

The Board responds that Plaintiffs' and Intervenors' claim for alleged loss of "valuable contractual interests" fails because this court found no violation of the Contracts Clause in *Zimmerman I.* 289 Kan. at 969. Additionally, the Board contends that Intervenors only received an easement to use the land for a certain purpose— *i.e.*, to set up commercial wind farms—and that there is no such thing as a severable wind estate for takings analysis.

In finding no taking, the district court, Judge Ireland, appeared to rely upon two grounds. First, he held that "[o]nce the district court [Judge Ireland] determined the zoning action was reasonable there is no taking under *Jack* [*v. City of Olathe*, 245 Kan. 458, 781 P.2d 1069 (1989)] and *McPherson Landfill* [*v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 49 P.3d 522 (2002)]."

Second, Judge Ireland held that as in *Jack* and *McPherson Landfill*, the Board did not abolish any existing rights, but only refused to expand existing rights:

"The County didn't take any existing rights away but only refused to expand the existing rights including wind rights. The plaintiff[s] and plaintiff's interven[o]rs have given this Court no cases which either distinguish or overrule *Jack* or *McPherson Landfill*. As such the taking claim of both the plaintiff[s] and plaintiff interven[o]rs are dismissed."

### Standard of Review

An appellate court has de novo review of constitutional questions. *Steffes v. City of Lawrence*, 284 Kan. 380, Syl. ¶ 4, 160 P.3d 843 (2007). More particularly, whether there has been a compensable taking is a question of law. *Estate of Kirkpatrick v. City of Olathe*, 289 Kan. 554, 559, 215 P.3d 561 (2009) (citing *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 [2007]). As mentioned, Judge Ireland's disposition can be considered a summary judgment and those standards also apply. See *Warner v. Stover*, 283 Kan. 453, Syl. ¶ 1, 153 P.3d 1245 (2007) (Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought.).

*Discussion*

We begin by acknowledging that the Takings Clause of the Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides that private property shall not be "taken for public use, without just compensation." *Lingle v. Chevron, U.S.A., Inc.,* 544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005); *Estate of Kirkpatrick,* 289 Kan. at 558. The Fifth Amendment's guarantee "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960).

As the *Lingle* Court acknowledged, beginning with *Penna Coal Co. v. Mahon,* 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), the Supreme Court has

"recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment. In Justice Holmes' storied but cryptic formulation, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.' 260 U.S. at 415. The rub, of course, has been—and remains—how to discern how far is 'too far.' In answering that question, we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good' [citation omitted] and that 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' *Mahon, supra,* at 413." *Lingle,* 544 U.S. at 537-38.

The United States Supreme Court has further observed that the "question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). As a result, the Supreme Court was "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action can be compensated by the government, rather than remain disproportionately concentrated on a few persons," with the result being "ad hoc, factual inquiries." *Frick v. City of*

*Salina*, 290 Kan. 869, 886, 235 P.3d 1211 (2010) (citing *Penn Central*, 438 U.S. at 123-24).

### a. *Reasonableness*

Plaintiffs first contend that Judge Ireland applied the wrong legal standard when, in summarily granting judgment against them, he ruled that simply because the Board action amending the zoning regulations was reasonable, then there was no taking. The Board merely responds that "the law clearly is that there is no taking that occurs if the zoning action is determined to be reasonable," citing *Jack*, 245 Kan. at 467, and *McPherson Landfill*, 274 Kan. at 334. If the Board is correct, our takings inquiry ends.

We agree with Plaintiffs. *McPherson Landfill* implicitly rejects the Board's position. There, this court addressed plaintiffs' arguments that Shawnee County's denial of their application for a conditional use permit was unreasonable and that the denial of their application constituted a taking. This court first held that the county's decision was reasonable. If the Wabaunsee County Board's position were correct, then the *McPherson Landfill* court would have simply rejected the takings argument because the permit denial was reasonable. Instead, the court proceeded to analyze in detail, and eventually deny, the takings claim.

The *McPherson Landfill* court admittedly gave no specific justification for further analyzing the takings issue. Its action is perhaps explained by the Court in *Lingle* 3 years later. More specifically, reasonableness, *e.g.*, arbitrariness, is an issue under the Due Process Clause of the United States Constitution, while takings is a Takings Clause issue. 544 U.S. at 540. Accordingly, if the governing body action is unreasonable, there cannot be a taking. The action is simply void. Only if the action is reasonable does a court proceed to address the takings issue:

"The Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property 'for public use.' It does not bar government from interfering with property rights, but rather requires compensation 'in the event of *otherwise proper interference* amounting to a taking.' [Citation omitted.] (Emphasis added.) Conversely, if a government action is found to be impermissible— for instance because it fails to meet the 'public use' requirement or *is so arbitrary*

*as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action."* (Emphasis added.) *Lingle*, 544 U.S. at 543.

See also *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 5 ("Although reasonableness is the standard by which we determine whether a government's exercise of police power is valid, reasonableness is not the appropriate standard to determine whether a government action affecting real property in private hands constitutes a taking.").

### b. *Refusal to expand existing rights*

We now turn to Plaintiffs' second contention. More specifically, they argue Judge Ireland further erred in granting judgment against them on their takings claims by declaring that the Board just "refused to expand the existing rights."

We begin our analysis by agreeing with the Board's assertion that there is no vested right in the continuity of zoning in a particular area so as to preclude subsequent amendment, *i.e.*, no right to have the existing zoning ordinance continue unchanged. *Houston v. Board of City Commissioners*, 218 Kan. 323, 543 P.2d 1010 (1975); *Colonial Investment Co., Inc. v. City of Leawood*, 7 Kan. App. 2d 660, 646 P.2d 1149 (1982). However, under the vested rights doctrine, if a vested property right existed before the change in zoning, "the changed law cannot control without being subject to a successful takings claim." Laitos, *Law of Property Rights Protections: Limitations on Governmental Powers*, § 9.02[B][1] (2011 Supp.). See Delaney & Vaias, *Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims*, 49 Wash. U. J. Urb. & Contemp. L., 27, 31 (1996) ("Only after landowners acquire vested rights under state law are they free to continue a project in the face of subsequent changes to land use regulations that would otherwise preclude continuing the project.").

Similarly, Kansas also recognizes the nonconforming use doctrine. Under this doctrine, one can seek to continue—after a restricting change in zoning law—an already established use. The party seeking to take advantage of its claimed right must prove that the "nonconforming use commenced prior to the enactment of the

ordinance restricting such use." *Crumbaker v. Hunt Midwest Mining, Inc.*, 275 Kan. 872, 881-82, 69 P.3d 601 (2003); see *Goodwin v. City of Kansas City*, 244 Kan. 28, 31-32, 766 P.2d 177 (1988). In *Crumbaker* we held that "[t]he nonconforming use doctrine is codified at K.S.A. 12-758 . . . : '. . . [R]egulations adopted under authority of this act [concerning planning and zoning in cities and counties] shall not apply to the existing *use* of any land but shall apply to any . . . *change in the use* of . . . land after the effective date of any regulations adopted under this act.' " (Emphasis added.) 275 Kan. at 882.

Accordingly, to prevail on a takings claim, a party seeking compensation must first establish that the property in question is one in which a vested interest exists, *i.e.*, a constitutionally cognizable property interest. *Landgraf v. USI Film Products*, 511 U.S. 244, 266, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) ("The Fifth Amendment's Takings Clause prevents the Legislature [and other government actors] from depriving private persons of *vested* property rights except for a 'public use' and upon payment of 'just compensation.' "); *Goodwin*, 244 Kan. 28, Syl. ¶ 8 (where a party has no vested right in the use of land, restriction on that use by a city does not constitute a taking of property).

This court has held that "[a] vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure." *Vaughan v. Nadel*, 228 Kan. 469, Syl. ¶ 3, 931 P.2d 664 (1980). Moreover,

"[r]ights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. [Citation omitted.] [On the other hand, *a*] '*mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right.* [Citation omitted.]' " (Emphasis added.) *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 41, 927 P.2d 466 (1996).

The Board and *amicus curiae* Protect the Flint Hills, Inc. (Protect) present a multitude of arguments for why Plaintiffs and Intervenors have no vested property rights. We need address only one, for it is dispositive. More particularly, the Board essentially argues that whatever interests these parties purportedly possessed before the moratorium, those interests were conditioned upon the

Board's discretionary issuance of a conditional use permit. Accordingly, interests such as developing, constructing, or operating CWECS were not vested rights.

We begin our analysis of this argument by examining the nature of conditional use permits (CUP's). According to one Kansas commentator, CUP's

"are a device for permitting certain land uses considered to be essential or desirable to the community to be placed in zoning districts in which they would ordinarily be *incompatible. The permitted use, however, must be reasonable and conform to standards or conditions designed to protect the interests of adjoining owners.*" (Emphasis added.) Heim, Kansas Local Government Law, § 4.47, p. 4-12 (4th ed. 2009).

Accord 83 Am. Jur. 2d, Zoning and Planning § 755.

The Board's authority to issue CUP's is found at K.S.A. 12-755(a), which states the governing bodies of Kansas cities and counties are authorized to adopt zoning regulations that may include "provisions which . . . (5) provide for the issuance of special use or conditional use permits."

As evidenced by the Board's November 2002 resolution establishing a moratorium on accepting or processing applications for CUP's for wind energy conversion systems, CUP's clearly were required for Plaintiffs and Intervenors to proceed. The Board's brief declares that CUP's were necessary "in order to construct structures of the height they were proposing. Issuance of a conditional use permit would not have been automatic." The Intervenors' petition states they "anticipate constructing a generator or generators . . . exceeding 125 feet in height, separately or in groups." According to the findings proposed by the Board and adopted by the district court, the turbines themselves would have been from 260' to 300' tall, with blades 125' in length.

We agree that an applicant has no vested rights in a CUP when its issuance depends upon the discretionary approval of the Board. See, *e.g.*, *R-Goshen LLC v. Village of Goshen*, 289 F. Supp. 2d 441, 450-51 (S.D.N.Y. 2003) (main element in determining the existence of a constitutionally cognizable property interest is the extent to which the deciding authority may exercise discretion in reaching its decision).

The case of *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 770 P.2d 423 (1989), provides guidance. There, this court addressed appellants' argument that the Kansas Racing Commission's refusal to disclose KBI background investigations violated their due process rights under the Kansas and United States Constitutions. The court ruled that its analysis first required an examination of the nature of an applicant's interest in the grant of a license under the Kansas Parimutuel Racing Act, K.S.A. 74-8801 *et seq.* Appellants contended their license applications created a protected property right in being awarded the licenses.

The *Kansas Racing Management* court first observed that to establish a property interest in a particular benefit, appellant must have a "legitimate claim of entitlement to it." 244 Kan. at 354 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 [1972]). The court then held that appellants could not demonstrate an entitlement or property interest in acquiring a license. It based its holding on the operative statute which gave the racing commission broad discretion in granting or denying the license, even if the applicant had complied with all statutory requirements. The statute, K.S.A. 74-8813(e), provided in relevant part:

" 'If an application is found to be in compliance [with the provisions of the Kansas Parimutuel Racing Act] and the commission finds that the issuance of the license would be within the best interests of horse and greyhound racing within this state . . . *as determined solely within the discretion of the commission,* the commission *may* issue an organization license to the applicant.' " (Emphasis added.) 244 Kan. at 355.

The court expressly rejected the appellants' comparison to *Rydd v. State Board of Health*, 202 Kan. 721, 451 P.2d 239 (1969), ruling that in *Rydd* the license sought for a day care center "was within the category of licenses which the State *must grant* if the applicant meets certain minimum requirements." (Emphasis added.) 244 Kan. at 355.

Similarly, in the instant case, at all material times, the zoning regulations granted absolute discretion to the Board for issuing conditional use permits. Section 31-101 of the 1995 Zoning Reg-

ulations, as well as of the July 2004 Zoning Regulations, is clear and unambiguous:

"Further, it is acknowledged that any property owner may seek a Conditional Use [Permit] for any of the types of land uses indicated herein for any property within the incorporated cities or the unincorporated portion of Wabaunsee County. *The subsequent approval of such request by the respective Governing Body is a purely discretionary act* that will be decided based upon the facts and circumstances discovered in the review of each application. *There is no implied 'right' for any person or landowner to obtain a Conditional Use for any use on any property."* (Emphasis added.)

Section 31-102 of the zoning regulations further provides that after the CUP application is submitted to the planning commission and the commission's recommendation is received by the Board,

"the governing body *may*, within the specifications herein provided, *permit* such buildings, structures, or uses; *provided* that the public health, safety, morals, and general welfare will not be adversely affected . . . and *that necessary safeguards will be provided for the protection of surrounding property, persons, and neighborhood values.* In this regard, the Governing Body may impose reasonable conditions on the approval of such Conditional Use . . . ." (Emphasis added.)

We conclude under these circumstances and under the rationale and holding of *Kansas Racing Management*, that the Board's issuance of a CUP to Plaintiffs and Intervenors to develop, construct, or operate CWECS was indeed not "automatic." As a result, whatever interest they may have possessed in the CUP could not be a vested property right. *Cf., McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 334, 49 P.3d 522 (2002) (CUP application for establishing and operating construction and demolition landfill on land zoned residential but previously allowed for quarrying under an earlier CUP; court held denial of CUP application was not a taking "but was a decision to deny the expansion of the existing right to use the property" for a quarry in the residential zone, *i.e.*, no vested right in operating landfill).

While *Kansas Racing Management* did not involve a discretionary denial of a CUP, that case's rationale and holding clearly are applicable to the instant case, as evidenced by *Beasley v. Flathead County*, 350 Mont. 177, 206 P.3d 915 (2009). There, the Montana Supreme Court addressed plaintiff's claim that, *inter alia*, the

county Board of Adjustment had taken his interest in a CUP without just compensation by refusing to transfer it. The *Beasley* court first observed that plaintiff's constitutional takings claim required him to establish he possessed a constitutionally protected property interest. It then determined whether a reasonable expectation of entitlement existed, noting that "[a]ny significant discretion conferred upon a local agency . . . defeats a claim of entitlement." 350 Mont. at 181.

The *Beasley* court observed that "[t]he Regulations vested discretion with the Board to determine whether to grant a CUP. Any interest that Beasley may have possessed in the CUP did not rise to the level of a protected property or liberty interest under these circumstances." 350 Mont. at 181. The court concluded that plaintiff's inability to establish that he possessed a protected property interest in obtaining the transfer of the CUP precluded him from establishing his takings claims. Without any further analysis deemed necessary, the court affirmed the trial court's granting of the motion to dismiss plaintiff's constitutional claims.

The discretionary decision analysis has been used by courts in cases involving other types of land use control as well. See *R-Goshen LLC*, 289 F. Supp. 2d at 450-51 (collecting cases); *Crowley v. Courville*, 76 F.3d 47 (2d Cir. 1996) (no constitutionally cognizable property interest in parking variance for retail building because zoning regulations vested zoning board with extremely broad discretion to grant or deny the variance); Laitos, *Law of Property Rights Protections: Limitations on Governmental Powers*, § 9.02[B][1], p. 9-13 (2011 Supp.) ("[I]f the developer has merely filed a development plan or application for plat/subdivision approval, that act will not constitute a vested right if the relevant government body still retains discretion to approve it.").

We find additional guidance in the recent case of *Jordan-Arapahoe, LLP v. Board of County Com'rs*, 633 F.3d 1022 (10th Cir. 2011). There, a developer argued that the county commissioners had deprived it of a vested property right when, after approval of the developer's preliminary development plan, the commissioners changed the zoning and denied the final development plan for building a car dealership. The Tenth Circuit Court of Appeals

pointed to the commissioners' discretion to deny the final plan as a basis for rejecting the claim, stating:

"We have explained generally that a landowner's protected interest in a particular zoning decision depends on 'whether there is discretion in the [local zoning authority] to deny a zoning or other application.' *Norton v. Vill. of Corrales*, 103 F.3d 928, 931-32 (10th Cir. 1996). . . . Accordingly, 'where the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue, no property interest is implicated.' *Crown Point I, LLC v. Intermountain Rural Elect. Ass'n*, 319 F.3d 1211, 1217 (10th Cir. 2003). . . .

"Jordan-Arapahoe [developer] must show, therefore, that under Colorado law Arapahoe County had limited discretion to change the zoning and to disapprove Jordan-Arapahoe's final development plan. Like the district court, we conclude Jordan-Arapahoe failed to make this showing and thus has not demonstrated a vested property interest . . . ." 633 F.3d at 1026.

Because at all material times the Board's zoning regulations did not just provide that issuance of a CUP was purely discretionary but additionally the July 2004 regulation changes completely eliminated the possibility of a CUP issuance for CWECS in particular, we conclude no vested property right of any type has been taken from Plaintiffs or Intervenors by the Board.

We recognize none of the cases we cite involved a moratorium on accepting or processing CUP applications as in the instant case. And only *Jordan-Arapahoe, LLP* involved any type of moratorium: a 4-week moratorium on all applications of development proposals which was extended 7 months, during which time the commission altered its zoning to make building a car dealership impossible. The *Jordan-Arapahoe, LLP* court did not address the moratorium factor, however, in its opinion. Nevertheless, we hold the presence of a moratorium here does not modify our rationale or holding for a number of reasons, several of which suffice.

First, the existence of a moratorium on accepting or processing applications for CUP's in which no vested property right ever existed can hardly support a takings argument.

Second, as the Board suggests, its moratorium on permits while a zoning amendment was pending with the planning commission, and ultimately the Board, is hardly a revolutionary concept. This court recognized the efficacy of moratorium ordinances, *i.e.*, "in-

terim development controls," in *Frick v. City of Salina*, 290 Kan. 869, 235 P.3d 1211 (2010). There, for almost 3 years, the city prohibited the construction of driveways, culverts, or other improvement within the right of way of its project and on a city street. We acknowledged that "comparable moratoria are widely used among land-use planners to preserve the status quo while formulating more permanent development strategies." 290 Kan. at 890. We eventually denied the plaintiffs' claims of a 3-year temporary taking under *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002).

Accordingly, we agree with the sentiments of one well-known commentator who has stated:

> "The adoption of moratoria while studies are being made and public meetings or hearings are being held on the formulation or reformulation of the municipality's comprehensive plan has become general practice. . . . *The purposes of the study might be completely frustrated if, while the study was being conducted and suggestions for change were being discussed, landowners could secure permits to build structures that might be nonconforming in height* or bulk, or that might be intended for uses which would be forbidden in locations to which the permits related. *The new plan, when adopted, might be defeated by uses and structures constructed during the period of study or for which the owners secured vested rights because of the issuance of permits therefor. Consequently, it is common practice to impose a moratorium on the issuance of: . . . (2) permits for particular types of structures or uses.*" (Emphasis added.) Ziegler, *Rathkopf's The Law of Zoning and Planning*, § 69:15, pp. 69-39 to 69-40 (2007).

See Ziegler, §§ 13:3; 13:8; 13.13. *Cf. Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149 (W.D.N.Y. 2006) (moratorium on permits for, or actual construction of, wind turbine powers and facilities in town "for a reasonable time pending the completion of a plan for control of construction of such structures in [town] as part of adoption of comprehensive zoning regulations"; original duration was for 6 months but eventually extended to 2 years; court denied business' request for preliminary injunction).

Because we have held there was no property for purposes of a takings claim, it is unnecessary to proceed with a full takings analysis, *e.g.*, per se (*Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538, 125 S. Ct. 2074, 161 L. Ed. 2d 876 [2005] [citing Lucas v. South*

*Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)]) or de facto (*Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 [1978]; see *Vanek v. State, Board of Fisheries*, 193 P.3d 283, 294 (Alaska 2008).

  c. *Inverse condemnation and takings claim under 42 U.S.C. § 1983*

Given our ruling there was no violation of the Takings Clause because no vested property right had been taken, it logically follows that there was no inverse condemnation and no violation of 42 U.S.C. § 1983 because both causes of action require loss of property or right. See *Estate of Kirkpatrick v. City of Olathe*, 289 Kan. 554, Syl. ¶ 1, 215 P.3d 561 (2009) (To succeed on a claim for inverse condemnation, a party must establish that a taking has occurred.); *McPherson Landfill, Inc.*, 274 Kan. at 334 (one seeking relief under § 1983 must establish deprivation of a federal right).

Accordingly, Judge Ireland did not err in dismissing the takings-based § 1983 claim on this ground: He held that because there was no deprivation of an existing federal right, *i.e.*, no taking, the claim failed. While he disposed of the inverse condemnation claim as a matter of law for the erroneous reason that the Board merely acted reasonably in passing the Resolution barring CWECS, a district court's decision may be upheld even though it relied on the wrong ground. See *Frick*, 290 Kan. at 904-05.

Issue 2: *The issue of whether the Board's decision to amend the zoning regulations violates the Commerce Clause is remanded to the district court.*

We ordered the parties in their supplemental briefing to thoroughly address all steps in the analysis of whether the Board's decision to amend its zoning regulations violated the "dormant" aspect of the Commerce Clause of the United States Constitution: (1) discrimination against interstate commerce and (2) burden on interstate commerce. We also ordered them to thoroughly address why, or why not, future discovery was necessary to resolve the Board's alleged violation of the Commerce Clause.

Plaintiffs and Intervenors both contend the district court erred in dismissing their claim that the Board's decision to amend the zoning regulations violates the dormant Commerce Clause. Specifically, Plaintiffs claim the Resolution formally reflecting the Board's decision to amend *facially* discriminates against interstate commerce because it permits wind generation for personal use (*i.e.*, SWECS) but prohibits wind generation for commercial use (*i.e.*, CWECS). Intervenors agree, adding that even if the ordinance is *not* facially discriminatory, it excessively burdens interstate commerce in relation to the local benefit.

In finding no dormant Commerce Clause violation, the district court, Judge Klinginsmith, explained:

"The Commerce Clause precludes local legislation that benefits in-state commerce while unfairly burdening out-of-state competitors. Resolution 04-18 makes no distinction between providers whose energy is transported across state lines and those whose energy remains within the boundaries of the county or the State of Kansas. It does not therefore violate the Commerce Clause of the United States Constitution."

## *Standard of review*

When a district court has granted a motion to dismiss for failure to state a claim, an appellate court must accept the facts alleged by the plaintiff as true, along with any inferences that can reasonably be drawn therefrom. The appellate court then decides whether those facts and inferences state a claim based on plaintiff's theory or any other possible theory. If so, the dismissal by the district court must be reversed. *Rector v. Tatham*, 287 Kan. 230, 232, 196 P.3d 364 (2008).

## *Discussion*

We begin by acknowledging that the Commerce Clause of the United States Constitution empowers Congress to "regulate Commerce . . . among the several states." Within this express grant to Congress, the United States Supreme Court recognizes a negative command, called the dormant Commerce Clause. *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 433, 125 S. Ct. 2419, 162 L. Ed. 2d 407 (2005) (citing

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S. Ct. 1331, 131 L. Ed. 2d 261 [1995]).

The dormant Commerce Clause is intended to protect the free flow of commerce and to safeguard Congress' latent power from encroachment by the states. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982). The dormant Commerce Clause effectuates the framers' purpose of preventing " 'a State from retreating into [the] economic isolation,' [citations omitted] 'that had plagued relations among the Colonies and later among the States under the Articles of Confederation.' " *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008) (citing *Hughes v. Oklahoma*, 441 U.S. 322, 325-26, 99 S. Ct. 1727, 60 L. Ed. 2d 250 [1979]). In essence, the dormant Commerce Clause prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273-74, 108 S. Ct. 1803, 100 L. Ed. 2d 302 (1988).

State regulations affecting interstate commerce are not immune from Commerce Clause scrutiny because they attach only to a local or intrastate activity. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 615, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981). Instead, alleged violations of the dormant Commerce Clause are subject to a two-step inquiry. *Davis*, 553 U.S. 338-39; *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 338, 346, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007).

First, a court asks whether the challenged law discriminates on its face against interstate commerce. "In this context, ' "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' [Citations omitted.]" *United Haulers*, 550 U.S. at 338-39. "A discriminatory law is 'virtually per se invalid,' [citation omitted] and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' [Citations omitted.]" *Davis*, 553 U.S. at 338-39.

Second, if the law is not facially discriminatory, the court then engages in a balancing test as set forth in *Pike v. Bruce Church,*

*Inc.*, 397 U.S. 137, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). See *United Haulers*, 550 U.S. at 345-46 (recognizing the second step as *Pike* analysis); *Davis*, 553 U.S. at 338-39 (same). In other words, a state law only incidentally affecting interstate commerce will be upheld " 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *United Haulers*, 550 U.S. at 346 (citing *Pike*, 397 U.S. at 142).

### a. *Facial discrimination*

In finding no violation of the dormant Commerce Clause, Judge Klinginsmith appeared to analyze whether the Board's zoning amendments facially discriminated against interstate commerce: step 1. The Board argues neither Plaintiffs nor Intervenors make a discrimination claim. We need not address this Board argument because we agree with the judge's conclusion that no facial discrimination exists.

More specifically, we cannot discern any " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' [Citations omitted.]" *United Haulers*, 550 U.S. at 338-39. The amended zoning regulations prohibit *all* commercial wind energy conversion systems in the county, regardless of whether the producer wishes to sell the wind-generated electricity in other states, in other Kansas counties, or within Wabaunsee County itself, *e.g.*, to the producer's next door neighbor. See *Blue Circle Cement v. Board of County Com'rs*, 27 F.3d 1499, 1512 (10th Cir. 1994) (a county zoning ordinance that banned all industrial waste recycling, disposal, or treatment was not discriminatory because it "confer[ed] no advantages on in-state entities seeking to store, treat, recycle, or dispose of [waste] as against out-of-state firms"). As the amended regulations themselves make clear, qualifying as an allowable "small wind energy conversion system" requires the wind-generated electricity to be "intended solely to reduce on-site consumption of purchased utility power." Article 1-104, § 210.

### b. *Pike analysis*

Absent this discrimination, the zoning amendments " 'will be upheld unless the burden imposed on [interstate] commerce is

clearly excessive in relation to the putative local benefits.' " *Davis*, 553 U.S. at 338-39 (citing *Pike*, 397 U.S. at 142). It does not appear that Judge Klinginsmith engaged in this next analytical step, *i.e.*, the *Pike* balancing test, "which is reserved for laws 'directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.' " *United Haulers*, 550 U.S. at 346. The *Pike* court described its test as follows:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." 397 U.S. at 141-42.

A number of federal circuit courts of appeal have distilled the *Pike* test as follows: The court considers (1) the nature of the putative local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is "clearly excessive" when weighed against these local putative benefits. See *Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005); *Star Scientific Inc. v. Beales*, 278 F.3d 339, 357 (4th Cir. 2002). The Tenth Circuit apparently also retains *Pike*'s reference to "whether the local interests can be promoted as well with a lesser impact on interstate commerce." *Blue Circle Cement*, 27 F.3d at 1512. In *Zimmerman I*, we essentially held that the zoning regulation amendments were directed to legitimate local public concerns, *e.g.*, aesthetics. Accordingly, our remaining analysis focuses on weighing the burdens placed on interstate commerce by the Board's decision against the local putative benefits.

For additional guidance, we first turn to *United Haulers*, 550 U.S. 330. There, a trade association of solid waste management companies and six haulers that operated in two New York counties

sued the counties under 42 U.S.C. § 1983 on the basis that the counties' flow control laws violated the Commerce Clause. The laws allegedly not only discriminated against interstate commerce but also placed an incidental burden on interstate commerce that outweighed the ordinances' benefits.

After finding no discrimination, the Court determined that the counties' ordinances were properly analyzed under *Pike*. It first noted:

"After years of discovery, both the Magistrate Judge and the District Court could not detect *any* disparate impact on out-of-state as opposed to in-state businesses. The Second Circuit alluded to, but did not endorse, a 'rather abstract harm' that may exist because 'the Counties' flow control ordinances have removed the waste generated in Oneida and Herkimer Counties from the national marketplace for waste processing services.' " 550 U.S. at 346 (citing 438 F.3d at 160).

The Court then stated:

"We find it unnecessary to [proceed to] decide whether the ordinances [actually] impose any incidental *burden* on interstate commerce because any *arguable* burden [as expressed by the lower courts] does not exceed the public *benefits* of the ordinances." (Emphasis added.) 550 U.S. at 346.

The Court then explained its rationale, concluding: "For these reasons, any arguable burden the ordinances impose on interstate commerce does not exceed their public benefits." 550 U.S. at 347.

The Court's particular handling of the *Pike* analysis, by a 4-justice plurality in Part II.D of the opinion, could support the argument of the Board and *amicus curiae* Protect that no discovery is needed in the instant case on the Commerce Clause issue. In other words, there simply is no "arguable burden" to exceed the public benefits, and this court could decide the issue as a matter of law.

In rejecting this argument, we first observe that unlike the instant case, the *Pike* analysis was performed in *United Haulers* at all three court levels "after years of discovery." 550 U.S. at 337, 346. We next observe that instructive caselaw disagrees with the Board and Protect. In *Lebanon Farms Disposal, Inc. v. County of Lebanon*, 538 F.3d 241 (3d Cir. 2008), the parties agreed that *United Haulers*, which was released while the case was on appeal, controlled the outcome of the appeal. However, they disagreed about the appropriate disposition. The County and the Greater Lebanon

Refuse Authority argued that their ordinances passed the *Pike* balancing test because they were indistinguishable from the ordinances considered in *United Haulers*. On the other hand, the disposal company argued that applying the *Pike* balancing test, instead of the strict scrutiny standard required after finding discrimination, yielded the same result as the district court's erroneously applied strict scrutiny review: the ordinances still violated the dormant Commerce Clause.

The Third Circuit vacated the district court's grant of partial summary judgment and the resulting permanent injunction and remanded, ordering the court to make necessary findings of fact and conclusions of law and to perform the *Pike* balancing test.

> *"Considering the strong language of the Supreme Court's holding in United Haulers, which found 'it unnecessary to decide whether the ordinances impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances,' 550 U.S. at 346, we perhaps could conduct the balancing test on the record as it exists and even conclude that any incidental burden on interstate commerce does or does not exceed the public benefits of the presently considered ordinances. We will not do so, however.* We find the Second Circuit's opinion in *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management*, 261 F.3d 245 (2d Cir.2001), to be particularly instructive. The Second Circuit correctly predicted the Supreme Court's eventual holding that '[f]low control regulations like the Oneida-Herkimer ordinances, which negatively impact all private businesses alike, regardless of whether in-state or out-of-state, in favor of a publicly owned facility, are not discriminatory under the dormant Commerce Clause.' *Id.* at 263. *It then 'admit[ted] a temptation to undertake the Pike balancing test in the first instance, . . . [a] temptation[, which] . . . arises from the well-settled principle that waste disposal is a traditional local government function.' Id.* at 263-64. *The court nonetheless decided to 'resist the temptation to rule as a matter of law prior to adequate discovery and further argument by the parties, which will undoubtedly assist the District Court in this fact-intensive determination.'* Id. at 263-64. It concluded:
>
>> 'We . . . hold . . . that although it does not, in and of itself, give a municipality free reign to place burdens on the free flow of commerce between the states, the fact that a municipality is acting within its traditional purview must factor into the District Court's determination of whether the local interests are substantially outweighed by the burdens on interstate commerce. *With that understanding, we reverse and remand for a determination of whether the Counties' flow control laws pass constitutional muster under the Pike balancing test.'*

*Id.* at 264. Only after the district court conducted the *Pike* balancing test and the Second Circuit affirmed did the Supreme Court's plurality in Part II.D affirm the application of the test. See *United Haulers*, 127 S. Ct. at 1797-98." (Emphasis added.) *Lebanon Farms Disposal, Inc.*, 538 F.3d at 251-52.

The Third Circuit concluded in *Lebanon Farms Disposal, Inc.*, that remand was appropriate:

"We will follow the approach of the Second Circuit. We will remand to the District Court to conduct the *Pike* balancing test and make findings of fact and conclusions of law for the record. In its present form, the record is incomplete regarding the burden on interstate commerce and, more importantly, the putative local benefits. Because the District Court did not have the benefit of the Supreme Court's decision in *United Haulers* and *because we do not have the benefit of the District Court's findings of fact and conclusions of law under the now relevant standard, we will remand with instructions to apply the Pike balancing test in accordance with Part II.D of United Haulers. After development of a proper factual record, this court will be in a better position to review the District Court's factual and legal conclusions, if asked.*" (Emphasis added.) 538 F.3d at 252.

We find further guidance in *Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009). There, similar to the instant case, the district court granted the defendant's motion to dismiss plaintiffs' Commerce Clause claim because it failed to allege that the defendant's policy discriminates against interstate commerce. And identical to the instant case:

"[T]he District Court incorrectly failed to further inquire if the policy otherwise violated the Commerce Clause. Specifically, the District Court did not acknowledge the well-established rule that, under the so-called *Pike* test, a nondiscriminatory regulation that 'regulates even-handedly to effectuate a legitimate local public interest,' *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), is nevertheless unconstitutional if 'the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.' *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Autho.*, 550 U.S. 330, 346 (quoting *Pike*, 397 U.S. at 142)." *Selevan*, 584 F.3d at 95.

The Second Circuit held that the plaintiffs' allegations were sufficient to state a claim under the Commerce Clause and the district court erred in dismissing. Instead of attempting to perform further analysis, *e.g.*, under *Pike*, the Second Circuit reversed and remanded, directing that the district court perform the analysis to

determine whether the dormant Commerce Clause had been violated by the policy.

See also *Association of Intern. Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 612-13 (2d Cir. 1996) (summary judgment on Commerce Clause claim concerning preemption inappropriate; "[s]ince there are genuine factual issues as to both the claimed burdens and the putative benefits created by the New York bumper statute, we remand for further development of the record in order to permit the district court to apply the *Pike v. Bruce Church* balancing test"); *Blue Circle Cement, Inc.*, 27 F.3d at 1512 (district court erroneously failed to conduct the *Pike* analysis after plaintiff had presented evidence creating material fact issues as to the Commerce Clause implications of the county ordinance and suggested it possessed other evidence of same; summary judgment reversed and remanded).

As mentioned, we ordered the parties to thoroughly address why, or why not, future discovery was necessary to resolve the Board's alleged violation of the Commerce Clause. We acknowledge the numerous additional arguments the Board makes to contend no remand for factual development is necessary, *i.e.*, the impact on interstate commerce is speculative and "[i]f this Court were to conclude that a *Pike* style test should be applied, there are numerous factors weighing overwhelmingly in favor of Wabaunsee County." The Board further points out that the zoning regulation is an exercise of police power, not commerce power, and for that reason enjoys a strong presumption of validity, citing *Maine v. Taylor*, 477 U.S. 131, 138, 106 S. Ct. 2440, 91 L. Ed. 2d 110 (1986).

All of the Board's arguments converge on a single point, however: that we should decide the balancing as a matter of law, when we only have the Board's arguments to consider. No fact-based arguments have been developed for the Plaintiffs and Intervenors. For example, this court cannot know how much electricity would be generated from Wabaunsee County wind and eventually kept out of the interstate power grid if there were no Board prohibition against CWECS. This type of information would be relevant in a *Pike* analysis. *Cf. Pike*, 397 U.S. at 145 (compelling grower to build

packing facilities that would cost approximately $200,000 constituted unlawful burden on interstate commerce).

Over objection of the Plaintiffs and Intervenors, they were denied a meaningful opportunity to discovery and an evidentiary hearing. Plaintiffs specifically argued in their response to the Board's motion to dismiss that "at best, no information has been developed to allow the Court to balance burdens and benefits of the County's ban of commercial wind energy generation systems."

After reading the briefs, hearing arguments and considering the case law stated above, we conclude this issue should be reversed and remanded to the district court. The court should allow discovery, conduct the *Pike* balancing test, and make findings of fact and conclusions of law for the record. After development of a proper factual record, this court will be in a better position to review the district court's factual and legal conclusions, if asked. See *Lebanon Farms Disposal*, 538 F.3d at 251.

### c. *Other arguments*

We have reviewed the multitude of other arguments of the parties and *amici curiae*. We conclude they have no merit. Several warrant addressing in the opinion.

The Board argues that because the amended zoning regulation concerns local land use, it is not the type of regulation that is within the protection of the dormant Commerce Clause. We disagree. In *Blue Circle Cement, Inc.*, a cement manufacturer challenged a zoning ordinance targeting hazardous waste. The Tenth Circuit Court of Appeals concluded the zoning regulation affected the dormant Commerce Clause and was subject to the *Pike* test. See also *Wood Marine Service, Inc. v. City of Harahan*, 858 F.2d 1061 (5th Cir. 1988) (zoning ordinance survived Commerce Clause scrutiny because "there is no evidence of even an incidental burden on interstate commerce"); *BFI Waste System of North America v. Dekalb County, GA*, 303 F. Supp. 2d 1335, 1356 (N.D. Ga. 2004) (zoning ordinance survived *Pike* balancing test and did not violate dormant Commerce Clause); *Island Silver & Spice v. Islamorada, Village of Islands*, 486 F. Supp. 2d 1347, 1352 (S.D. Fla. 2007) (zoning

ordinance did not survive *Pike* balancing test and violated dormant Commerce Clause).

We further observe that the *Pike* test itself contains the element of "local" public interests. It provides: "If a *legitimate local purpose* is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the *local interest* involved." (Emphasis added.) *Pike*, 397 U.S. at 142.

In an argument the Board admits is quite similar to the one above, the Board argues that we need not apply the *Pike* test to the facts of the instant case. It claims that two recent United States Supreme Court opinions are the latest of several where the Court found that "some state regulations simply do not require an analysis under the *Pike* test." They cite *United Haulers*, 550 U.S. 330, and *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008). We disagree. As discussed above, and as acknowledged by the *Davis* Court, *"United Haulers* included a *Pike* analysis." 553 U.S. at 353.

As for *Davis*, we note that the Court acknowledged:

"Concluding that a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, *for we generally leave the courtroom door open to plaintiffs invoking the rule in Pike*, that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice." (Emphasis added.) 553 U.S. at 353.

Additionally, *Davis* is easily distinguishable: it is not a land use case. It involved the State of Kentucky's income tax structure that exempted the interest on bonds issued by Kentucky or its subdivisions from state income tax, while taxing interest income on bonds from other states and their subdivisions. Moreover, the Court admitted:

"It would miss the mark to think that the Kentucky courts, and ultimately this Court, are being invited merely to tinker with details of a tax scheme; *we are being asked to apply a federal rule to throw out the system of financing municipal improvements throughout most of the United States*, and the rule in *Pike* was never intended to authorize a court to expose the States to the uncertainties of the economic experimentation the Davises request." (Emphasis added.) 553 U.S. at 356.

By contrast, the instant case involved one county and its zoning regulations. *United Haulers* involved two counties; the Court performed the *Pike* analysis.

*Amicus curiae* Protect plays a variation on this basic theme. It argues that through enactment of federal statutes, Congress has eliminated any role for dormant negative Commerce Clause analysis in the siting of wind energy electric generation facilities. More particularly, Protect contends that Congress has expressly left the regulation of the generation of electric energy to the states.

Before beginning, we should acknowledge the Supreme Court's declaration that "[i]t is difficult to conceive of a more basic element of interstate commerce than electric energy, a product used in virtually every home and every commercial or manufacturing facility. No state relies solely on its own resources in this respect." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 757, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982). Accordingly, as a general rule electric energy would be afforded protection under the Commerce Clause. See *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341, 102 S. Ct. 1096, 71 L. Ed. 2d 188 (1982).

As support for Protect's argument, it relies upon two sections of the Federal Power Act: (1) 16 U.S.C. § 824(a) (2006), and (2) § 731 of the Energy Policy Act of 1992, Public Law 102-486, 106 Stat. 2776, which is reprinted as a statutory note at 16 U.S.C. § 796 (2006) and 16 U.S.C. § 824.

### 1. *The Federal Power Act of 1935: 16 U.S.C. § 824(a)*

Protect argues that in the area of the generation of electricity, "Congress has said that federal regulatory jurisdiction, even in matters impacting interstate commerce, extends *'only to those matters that are not subject to state regulation.'* 16 U.S.C. § 824(a)." (Emphasis added.) This snippet of quoted language is from § 201(a) of the Federal Power Act, codified at 16 U.S.C. § 824(a), which provides:

"It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business

which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, *such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.*" (Emphasis added.)

We start our analysis of Protect's argument by agreeing with its underlying premise: Congress may authorize the states to engage in activities that would otherwise be forbidden by the Commerce Clause. *Maine v. Taylor*, 477 U.S. 131, 138, 106 S. Ct. 2440, 91 L. Ed. 2d 110 (1986) (citing *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769, 65 S. Ct. 1515, 89 L. Ed. 1915 [1945]); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (Congress may confer "upon the states an ability to restrict the flow of interstate commerce that they would not otherwise enjoy").

The Supreme Court has also held, however, that "because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, [the] Court has exempted state statutes from the implied limitations of the Clause *only when the congressional direction to do so has been 'unmistakably clear.'* " (Emphasis added.) *Maine v. Taylor*, 477 U.S. at 138-39 (citing *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 91, 104 S. Ct. 2237, 81 L. Ed. 2d 71 [1984]). Stated by the Court another way, "Congress must manifest its *unambiguous intent* before a federal statute will be read to permit or to approve such a violation of the Commerce Clause . . . ." (Emphasis added.) *Wyoming v. Oklahoma*, 502 U.S. 437, 458, 112 S. Ct. 789, 117 L. Ed. 2d 1 (1992). As a result, the Court has declared that "[w]hen Congress has not 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause," the courts lack "authority to rewrite legislation based on mere speculation as to what Congress 'probably had in mind.' " *New England Power Co. v. New Hampshire*, 455 U.S. at 343. After reviewing the plain language of § 824(a), we have difficulty concluding it is a manifestation of Congress' unambiguous intent, expressed through unmistakably clear language, to permit the states to regulate the generation of electric energy free from Commerce Clause restraint.

Instead, the statute more properly appears to merely define the extent of the federal preemptive effect on state law. In *New Eng-*

368

*land Power Co.*, the Court held that a related statute, 16 U.S.C. § 824(b), did not provide an affirmative grant of authority to the states to restrict interstate commerce inconsistent with the Commerce Clause. The Court first observed that "Section 201(b) of the Act [16 U.S.C. § 824(b)] provides, *inter alia*, that the provisions of Part II 'shall not . . . deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line.'" 455 U.S. at 341. But the Court then concluded this language did not support New Hampshire's position of exemption from the Commerce Clause:

"However, this provision is in no sense an affirmative grant of power to the states to burden interstate commerce 'in a manner which would otherwise not be permissible.' Southern Pacific Co. v. Arizona ex rel. Sullivan, supra, at 769. In § 201(b), Congress did no more than leave standing whatever valid state laws then existed relating to the exportation of hydroelectric energy; by its plain terms, § 201(b) simply saves from pre-emption under Part II of the Federal Power Act such state authority as was otherwise 'lawful.' The legislative history of the Act likewise indicates that Congress intended only that its legislation 'tak[e] no authority from State commissions.' H.R.Rep.No.1318, 74th Cong., 1st Sess., 8 (1935) (emphasis added)." 455 U.S. at 341.

The *New England Power Co.* Court went on to explain:

"Nothing in the legislative history or language of the statute evinces a congressional intent 'to alter the limits of state power otherwise imposed by the Commerce Clause,' *United States v. Public Utilities Comm'n of California, supra*, 345 U.S., at 304, 73 S. Ct., at 712, or to modify the earlier holdings of this Court concerning the limits of state authority to restrain interstate trade. *E.g., Pennsylvania v. West Virginia*, 262 U.S. 553 (1923); *West v. Kansas Natural Gas Co.*, 221 U.S. 229 (1911)." 455 U.S. at 341.

The Court concluded instead that "Congress' concern was simply 'to define the extent of the federal legislation's pre-emptive effect on state law.' *Lewis v. BT Investment Managers, Inc., supra*, [447 U.S.] at 49." 455 U.S. at 341.

Ten years later the Court rejected a similar Commerce Clause exemption argument in *Wyoming v. Oklahoma*, 502 U.S. 437. There, Wyoming challenged an Oklahoma statute that required Oklahoma's coal-fired electric generating plants to burn a coal mixture containing at least 10 per cent Oklahoma coal. Oklahoma ar-

gued that the "savings clause" in § 824(b)(1) of the Federal Power Act delivered its statute from Commerce Clause scrutiny. That section provided for federal regulation of "electric energy at wholesale in interstate commerce," but reserved to the states the regulation of "any other sale of electric energy." 16 U.S.C. § 824(b)(1).

Accordingly, Oklahoma argued its quota statute was a proper exercise of its authority to regulate local retail electric rates which in turn permitted discriminatory impact on the movement of Wyoming coal in interstate commerce. More specifically, Oklahoma contended that included in its authority to ensure lower local utility rates was the authority to, among other things, reduce over-dependence on a single source of supply, *e.g.*, Wyoming.

The Court agreed that Oklahoma had certain authority under the Federal Power Act. But after reviewing the holding and rationale in *New England Power Co.*, including the determination that § 824(b)(1) simply saved from preemption under the Act such state authority as was otherwise "lawful," the *Wyoming* Court held Congress had not manifested its unambiguous intent to permit Oklahoma's Commerce Clause violation. The Court also observed it had "uniformly subjected Commerce Clause cases implicating the Federal Power Act to scrutiny on their merits," *i.e.*, Congress had not unambiguously empowered states to burden or discriminate against interstate commerce. 502 U.S. at 458.

Based upon this Federal Power Act caselaw, we conclude § 824(a) of the Act does not, through unmistakably clear language, affirmatively grant power to the states to burden interstate commerce. Rather, the statute means that (1) Congress has not preempted the Board's zoning regulations; but (2) these regulations are nevertheless still subject to Commerce Clause scrutiny. See also *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982) (although water statutes demonstrate Congress' deference to state law, they do not indicate Congress wished to remove federal constitutional constraints on state laws); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 49, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980) ("[I]t appears that Congress' concern was to define the extent of the federal legislation's pre-emptive effect on state law." Thus, the federal act "ap-

plies only to state legislation that operates within the boundaries marked by the Commerce Clause."). Contrast, *e.g., In Western & Southern L. I. Co. v. State Bd. of Equalization*, 451 U.S. 648, 653-54, 101 S. Ct. 2070, 68 L. Ed. 2d 514 (1981).

### 2. *The Energy Policy Act of 1992*

Protect next argues that even greater support for its claim of exemption from Commerce Clause scrutiny is found in recent federal legislation, suggesting there can now be no real debate about the persuasiveness of its position. It argues: "Moreover, more recent legislation makes it clear that although the federal government now regulates such things as maximum emissions levels and rates, supervises interstate activity, and oversees other public safety standards, *the siting of specific power facilities is left at the state level.*" (Emphasis added.)

In support of Protect's argument, it points out that the Energy Policy Act of 1992 provides:

"Nothing in this title or in any amendment made by this title shall be construed as affecting or intending to affect, or in any way to interfere with, *the authority of any State or local government relating to* environmental protection or *the siting of facilities.*" (Emphasis added.) Energy Policy Act of 1992, Pub. L. No. 102-486, § 731, 106 Stat. 2776, 2921 (1992).

Among other things, Protect also relies upon *Tampa Elec. Co. v. Garcia*, 767 So. 2d 428, 436 (Fla. 2000). There, based upon this statutory language (§ 731), the Florida Supreme Court rejected appellee's arguments that the state statute on siting of generating plants violated the dormant Commerce Clause and was preempted by the Energy Policy Act of 1992. The court concluded that "power-plant siting and need determination are areas that Congress has expressly left to the states." 767 So. 2d at 436.

We begin our analysis of this argument by repeating the standards of review described above: Congress' language authorizing states to engage in activities that would otherwise be forbidden by the Commerce Clause must be "unmistakably clear," and Congress must manifest its "unambiguous intent" to do so. As a result, it makes sense that we first look for guidance in a Supreme Court decision involving statutory language very similar to the language

Protect cites from the Energy Policy Act: *Sporhase v. Nebraska*, 458 U.S. 941.

In *Sporhase*, the Supreme Court considered whether a Nebraska state water law impermissibly interfered with interstate commerce. Nebraska argued that Congress had "authorized the States to impose otherwise impermissible burdens on interstate commerce in ground water." 458 U.S. at 958. In support of its argument, Nebraska cited to 37 statutes in which Congress deferred to state water law, as well as to a number of interstate compacts dealing with water rights that received congressional approval.

The Court determined that the statute discussed by Nebraska, Section 8 of the Reclamation Act of 1902, 32 Stat. 390, was typical of the 37 statutes. Section 8 of the Act contains language quite similar to the statute, § 731, upon which Protect relies:

" '[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation.' " 458 U.S. at 959.

In comparison, § 731 of the Energy Policy Act cited by Protect provides:

"Nothing in this title or in any amendment made by this title shall be construed as affecting or intending to affect, or in any way to interfere with, the authority of any State or local government relating to environmental protection or the siting of facilities."

The *Sporhase* Court first held that the cited language "defines the *extent* of the federal legislation's pre-emptive effect on state law." (Emphasis added.) 458 U.S. at 959 (citing *New England Power Co.*, 455 U.S. at 341; *Lewis v. BT Investment Managers, Inc.*, 447 U.S. at 49). It then quickly rejected Nebraska's contention:

"*Although the 37 statutes and the interstate compacts demonstrate Congress' deference to state water law, they do not indicate that Congress wished to remove federal constitutional constraints on such state laws. The negative implications of the Commerce Clause, like the mandates of the Fourteenth Amendment, are ingredients of the valid state law to which Congress has deferred.* Neither the fact that Congress has chosen not to create a federal water law to govern water rights involved in federal projects, nor the fact that Congress has been willing to let the States settle their differences over water rights through mutual agreement, con-

stitutes persuasive evidence that Congress consented to the unilateral imposition of unreasonable burdens on commerce. In the instances in which we have found such consent, Congress' ' "intent and policy" to sustain state legislation from attack under the Commerce Clause' was "expressly stated." ' " (Emphasis added.) 458 U.S. at 959-60.

Just as the *Sporhase* Court rejected Nebraska's argument, we reject for the same reasons the same argument by Protect based upon virtually the same language.

The case of *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, cited in *Sporhase*, provides additional support. There, the state of Florida argued that the federal Bank Holding Company Act of 1956 permitted the state to pass legislation that might otherwise violate the Commerce Clause, *i.e.*, prohibiting out of state banks from owning or controlling businesses within the state that provided investment advisory services. Section 7 of the Act (12 U.S.C. § 1846) stated:

" 'The enactment by the Congress of the Bank Holding Company Act of 1956 *shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have* with respect to banks, bank holding companies, and subsidiaries thereof.' 70 *Stat. 138."* (Emphasis added.) 447 U.S. at 45-46 n.12.

The *Lewis* Court held the legislation was an invalid restriction on interstate commerce. It first acknowledged that § 7 "does reserve to the States a general power to enact regulations applicable to bank holding companies. This section was intended to preserve existing state regulations of bank holding companies, even if they were more restrictive than federal law." 447 U.S. at 48-49. However, the Court held § 7 was not "intended to extend to the states new powers to regulate banking that they would not have possessed absent the federal legislation. Rather, it appears that Congress' concern was to define the extent of the federal legislation's preemptive effect on state law." 447 U.S. at 49. The Court concluded that § 7 applied "only to state legislation that operates within the boundaries marked by the Commerce Clause." 447 U.S. at 49.

Finally, we observe that while the commentary is limited regarding the case upon which Protect relies, *Tampa Elec. Co. v. Garcia*, it has been unanimously negative. See Ramsey, *Power*

*Plant Siting in a Deregulated Electric Energy Industry; Discerning the Constitutionality of Siting Statutes under the Dormant Commerce Clause*, 21 J. Land Use & Envtl. L. 91 (Fall 2005); Note, *Federalism, Electric Industry Restructuring, and the Dormant Commerce Clause: Tampa Electric Co. v. Garcia and State Restrictions on the Development of Merchant Power Plants*, 43 Nat. Resources J. 615 (Spring 2003); Fels & Lindh, *Lessons from the California "Apocalypse": Jurisdiction over Electric Utilities*, 22 Energy L.J. 1 (2001).

As the authors wrote in *Lessons from the California "Apocalypse,"* 22 Energy L.J. at 30:

"We believe that the Florida court's reliance on Section 731 of the Energy Policy Act was misplaced . . . United States Supreme Court precedent requires an 'unambiguous' expression of congressional intent in order to shield protectionist state regulation from invalidation under the Commerce Clause. By its terms, section 731 does no more than leave unaffected whatever authority the states had, prior to enactment of the Energy Policy Act, to regulate siting decisions; *certainly nothing in section 731 can be read as an affirmative grant of authority to the states to discriminate in favor of their own residents against interstate commerce.*" (Emphasis added.)

CONCLUSION

1. We affirm the district court's disposition of (a) the claim under the Takings Clause; (b) the related takings-based claim under 42 U.S.C. § 1983; and (c) the inverse condemnation claim.
2. We affirm the district court's dismissal of the dormant Commerce Clause claim alleging discrimination against interstate commerce.
3. We reverse the district court's apparent dismissal of the Commerce Clause claim alleging the Board's decision to amend the zoning regulations placed incidental burdens on interstate commerce that outweighed the benefits. As a result, the court's dismissal of the related burden-based claim under 42 U.S.C. § 1983 is also reversed. See *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management*, 550 U.S. 330, 337, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007) (42 U.S.C. § 1983 claim included allegation that counties' ordinances vi-

olated the Commerce Clause by placing an incidental burden on interstate commerce that outweighed the ordinances' benefits).

4. We remand to the district court with instructions to allow discovery on the Commerce Clause burden-based claim, to conduct the *Pike* balancing test, and to make findings of fact and conclusions of law on that claim and any other issues that may remain.